Filed 5/15/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ROY THINNES BUTLER,<br><br>        on Habeas Corpus. | A139411<br><br>(Alameda County<br>Super. Ct. No. 91694B) |

Roy Butler, a parole eligible life prisoner, challenged the constitutionality of the process used by the Board of Prison Terms (Board) to determine whether prisoners such as him are suitable for release on parole. Specifically, he contended that the Board's practice of deferring the fixing of a prisoner's base term (which measures individual culpability for the commitment offense) and adjusted base term (which modifies the base term on the basis of factors relating to other offenses) until after he or she is deemed suitable for release, effectively eliminated any meaningful consideration of proportionality in sentencing during the most crucial portion of the parole process, and therefore facilitated imposition of constitutionally excessive punishment.

Before the completion of briefing, the parties settled their dispute by stipulating to an order of this court directing the Board to publicly announce and implement new policies and procedures that would result in the setting of base terms and adjusted base terms at life inmates' initial parole consideration hearings or, if that hearing had already taken place, at the next hearing resulting in a grant or denial of parole. We have issued that order.

Remaining before the court is petitioner's motion for an award of reasonable attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5). The motion

1

raises two distinct issues:  whether such fees may be awarded under section 1021.5 and, if so, the reasonable amount of such fees.

## BACKGROUND

Claiming that the Board "failed to fix his term at a number of years proportionate to his crime," as required by law,  Butler's petition focused on the Board's regulations and practice of deferring the setting of a base term for a parole eligible life prisoner unless and until after he or she is found suitable for release on parole.  (Cal. Code Regs., tit. 15 (Regs.), §§ 2282, subd. (a), 2403, subd. (a).)  According to Butler, the challenged practice failed to comport with article I, section 17, of the California Constitution and the Eighth Amendment to the United States Constitution, deprived him and all parole eligible life prisoners a fair parole hearing and the due process guaranteed by the state and federal Constitutions, and obstructed judicial review of claims that the denial of parole resulted in constitutionally excessive punishment.

On January 30, 2012, we ordered the appointment of counsel to represent Butler, investigate and research whether to file a supplemental petition to refine his claim, and determine the need for the discovery Butler sought.  On February 11, 2013, we appointed Jon B. Streeter, then a partner in the firm of Keker & Van Nest, counsel for Butler.[1]

On May 28, 2013, appointed counsel filed a supplemental petition for writ of habeas corpus refining the contentions Butler had asserted in his own behalf together with a motion for discovery.[2]  We issued an order to show cause on August 9, 2013, but

---

[1] After Jon B. Streeter was nominated by the Governor for appointment to this court, which occurred after the filing of the fee motion before us, he withdrew from the case and was replaced by Susan J. Harriman, also a partner at Keker & Van Nest, who was assisted by Sharif E. Jacob and Benita Brahmbhatt, firm associates, who had also assisted Streeter.

[2] The supplemental petition also added a claim that the Board's decision to deny Butler parole was unsupported by some evidence.  Because this individual claim was distinct from Butler's constitutional claims, which challenged the parole process applicable to all life prisoners, we bifurcated the issues into separate cases.  With respect to the individual claim (*In re Butler* case No. A137273), we granted Butler's habeas petition on March 5, 2014.  In response to that ruling the Board vacated its decision

2

deferred briefing on the constitutional claims until resolution of Butler's discovery motion. On the same day we issued an order directing the Board to produce some of the materials Butler requested, and directed the parties to meet and confer regarding the remaining requests. On September 9, 2013, after they met and conferred, the parties filed a Joint Status Report.

Several weeks later, after the court conducted an informal discovery conference, counsel for the parties informed the court they wished to commence settlement discussions and requested designation of a justice of another division to facilitate that enterprise. Justice Jim Humes, then a member of Division Four of this court and now Presiding Justice of Division One, agreed to be so designated. Counsel for the parties, as well as the executive officer of the Board and its general counsel, participated in three settlement conferences with Justice Humes.

At the final conference, on December 13, 2013, the parties settled the case by stipulating to an order of this court directing, among other things, that: "as soon as is practicable, the Board shall begin implementation of new policies and procedures that will result in the setting of base terms and adjusted base terms for life term inmates at their initial parole consideration hearing, or at the next scheduled parole consideration hearing that results in a grant of parole, a denial of parole, a tie vote, or a stipulated denial of parole."[3] The stipulation also provided that "the Board will commence rulemaking proceedings designed to memorialize and embody said new policies and procedures."

---

denying parole and held a new hearing at which Butler was granted parole. *Butler* does not seek to recover fees for his counsel's work on the individual claim that he was unlawfully denied parole. (*See Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1226 [pointing out that fees may be awarded under section 1021.5 "to only that portion of the attorneys' efforts that furthered the litigation issues of public importance"].)

[3] The Stipulation and Order Regarding Settlement include the following specific provisos: "The base term will be established pursuant to the matrices and directives found in California Code of Regulations, title 15, sections 2282-2284, 2320-2321, 2329, 2403-2405, 2423-2425, and 2433-2435. [¶] The adjusted base term refers to the base term after it has been adjusted for enhancements pursuant to California Code of

3

On December 16, 2013, upon the request of the parties set forth in their stipulation, this court issued an order directing that "the Board shall, at the next publicly noticed Board meeting, announce a policy of calculating the base term and adjusted base term for all life inmates at the initial parole consideration hearing. The Board will implement this policy on the first day of the calendar month following the aforementioned meeting."

On October 21, 2014, Butler filed a motion requesting an award of reasonable attorneys' fees under section 1021.5. The amount sought is $439,421.65.

The Board maintains the motion is deficient in two respects: that Butler is not entitled to fees "because the settlement agreement did not result in the enforcement of an important right affecting the public interest," as required by section 1021.5, and that, even if he is entitled to fees under the statute, the amount Butler requests is unreasonable. We disagree with the Attorney General's first contention, but agree with the second.

---

Regulations, title 15, sections 2285-2288, 2322-2326, 2406-2409, 2426-2428, and 2436-2438."

The terminology of the Stipulation and Order Regarding Settlement is not entirely consistent with that of the regulations. Many of the relevant regulations refer to "base term" but some use "base period of confinement" instead. (Regs., §§ 2320, 2329.) More significantly, the phrase "adjusted base term" does not appear in the regulations. Section 2289 employs "adjusted life term" to describe the result of adding the "specific enhancements" to the term set for the "life crime," then deducting preprison credit and adding time "at large." (Regs., §§ 2285, 2286, 2289.) Other regulations provide for "adjustments" to be added to the base term. (Regs., §§ 2406, 2407, 2408, 2409, 2411, 2426, 2427, 2428.) Under regulations section 2411, the "adjusted period of confinement" is the result of adding the term for the base crime and "adjustments," then subtracting postconviction credit. (Regs., § 2411.) Still other regulations refer to "adjustments" for preconviction, conviction, and postconviction factors which may increase or decrease the "total period of confinement." (Regs., §§ 2319, 2322, 2323, 2324.)

It is to be hoped that in promulgating its new regulations pursuant to the settlement, the Board will take advantage of the opportunity to simplify the regulations and reduce the confusion that may result from the varying terminology.

4

# I.

## Butler is Entitled to an Award of Fees Under Section 1021.5

As material, section 1021.5 provides that "a court may award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.)  " 'The determination that the public policy vindicated is one of constitutional stature . . . establishes the first of the . . . elements requisite to the award (i.e., the relative societal importance of the public policy vindicated).' " (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 318, quoting *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 46, fn. 18.)  Moreover, the California Supreme Court has recognized that prisoners' constitutional rights "reflect strong public policies, any institutional violation of which of necessity affects a large number of persons, most of whom are ill equipped by education, training, or financial ability to initiate and adequately prosecute legal actions to vindicate those rights without the assistance of counsel." (*In re Head* (1986) 42 Cal.3d 223, 229.)

"[R]elief obtained through a settlement may qualify a [litigant] as the prevailing party, even in the presence of a stipulation disclaiming liability on the merits." (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, at p. 1345)  "The critical fact is the impact of the action, not the manner of its resolution." (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 685.)  It is also undisputed that prison inmates who successfully challenge in habeas corpus proceedings the procedures they are subjected to by prison authorities may be awarded attorney fees under section 1021.5. (*In re Head, supra,* 42 Cal.3d 223.)

The controversy in this case thus comes down to whether "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons." (§ 1021.5.)  The parties' fundamental disagreement is over the role of

the "base term" and "adjusted base term" in the sentencing scheme prescribed by the Determinate Sentence Law (DSL) (Pen. Code, § 1170, et seq.), and the practical significance of *prompt* term-setting.

## A.

### *The Competing Contentions of the Parties*

The penal purpose of the DSL and the sentencing principles it is built upon are set forth in the statute's opening sentences: "The Legislature finds and declares that the purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." (Pen. Code, § 1170, subd. (a)(1).) Proportionality refers to individual culpability based on the circumstances of a particular crime (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1096 (*Dannenberg*)), while uniformity, as indicated in Penal Code section 1170, refers to a comparison between offenders committing similar offenses in similar circumstances. Butler believes the base and adjusted base terms referred to in the settlement are the measure of the proportionality in sentencing the DSL was designed to achieve; whereas the Board sees these terms as measures only of uniformity in sentencing.

According to Butler, the Board's former policy of deferring the setting of the base and adjusted base terms term until the inmate was found suitable for release was conducive to disproportionate sentencing because it excluded any consideration of individual culpability for the commitment offense—which is the referent of proportionality—during the most crucial portion of the parole process. Butler maintains that the effect of the Board's former practice of deferring the setting of the base term was to "untether" the Board's determinations of inmate suitability for release on parole from any consideration of the proportionality of the sentence that resulted from denying parole. As Butler sees it, under the Board's former practice, proportionality (and uniformity) were not taken into account by the Board until *after* constitutionally excessive punishment had *already* been imposed by the systematic denial of prior requests for release on parole. Butler's request for an award of fees under section 1021.5 is based on

6

the theory that prompt setting of the base and adjusted base term required by the settlement helps "ensure life prisoners do not serve terms disproportionate to the culpability of the individual offender." (*In re Stoneroad* (2013) 215 Cal.App.4th 596, at p. 617.)

Focusing on uniformity rather than proportionality, the Board sees the issue very differently. According to it, the settlement and stipulated order merely create "a new, mutually beneficial term-setting policy," not "the vindication of a right the Board had previously violated or curtailed." This is so, the Board argues, "because the 'right' [Butler] asserts—that of a base term calculation at the initial parole suitability hearing— did not exist until the settlement went into effect." According to the Board, "Butler did not demonstrate, and no court has held, that the Board's previous practice of setting the base term only after a finding of parole suitability was unlawful or violated a public right. On the contrary, the Supreme Court explicitly upheld this practice in *In re Dannenberg, supra,* 34 Cal.4th at page 1095, finding that the Board need not 'refer to its base term matrices . . . before deeming a particular life inmate unsuitable' for parole. Nor is there a statutory requirement that a base term be set before a finding of suitability for parole. [Citation.] Put simply, Butler cannot establish that the settlement resulted in the enforcement of an important right when the right he asserts never existed in the first place."

Putting aside for a moment the meaning and effect of *Dannenberg, supra*, 34 Cal.4th 1061, the Board mischaracterizes Butler's contention. Butler did not assert a pre-existing right to calculation of a base term before the determination of suitability for parole release. His claim was that the Board's prior term-setting practice permitted the violation of his and other inmates' right to a constitutionally proportionate sentence. The prompt term-setting agreed to in the settlement, which will ensure consideration of proportionality at a meaningful stage of the parole process, is a means of rectifying this problem.

The Board's contention that that Butler cannot be awarded fees under section 1021.5 without demonstrating that the Board's previous term-setting practice "was

7

unlawful or violated a public right" or "that the Board did 'something to adversely affect the public interest' that was cured through [this] litigation" is misguided. The *only* authority the Board cites in support of its interpretation of the requirements of section 1021.5 is language in *In re Joshua S.* (2008) 42 Cal.4th 945 (*Joshua S.*). Unlike the present case, *Joshua S.* was not settled and did not relate to the question whether the litigation enforced an important right or conferred a "substantial benefit." The issue in the case related instead to "the necessity and financial burden of private enforcement" (*ibid.*) requirement.[4] Most importantly, as the Supreme Court later noted, *Joshua S.* "did not explicate or apply the usual section 1021.5 criteria. . . . Instead, . . . we recognized an *exception* to be applied in cases where all three factors [required by section 1021.5] are satisfied, but the party from whom fees are sought 'is not the type of party on whom private attorney general fees were intended to be imposed.' (*Joshua S.,* at p. 953.)" (*Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1027, fn. omitted.)

Further, contrary to the Board's suggestion, *Dannenberg* did not render Butler's legal claim untenable. The Board relies upon the *Dannenberg* court's holding that, because dangerousness and public safety take precedence over uniformity in sentencing,

---

[4] *Joshua S.* was a suit between former domestic partners concerning the validity of a "second parent" adoption for unmarried same-sex parents. The birthmother tried but failed to prevent her former partner from legally adopting the child, and the parties agreed, as did the Court of Appeal and the Supreme Court, that the litigation "did yield a substantial and widespread public benefit." (*Joshua S., supra,* 42 Cal.4th at p. 952.) Nevertheless, the Supreme Court concluded that "even when an important rights has been vindicated and a substantial benefit conferred, and when a plaintiff's litigation has transcended her personal interest, . . . section 1025.1 was not intended to impose fees on an individual seeking a judgment that determines only his or her private rights, but who has done nothing to adversely affect the public interest other than being on the losing side of an important appellate case." (*Id.* at p. 958.) The situation in this case bears no similarity to that in *Joshua S.* Unlike his distinct claim that there is not some evidence justifying the denial of his application for parole, which we have separated from the present proceeding, Butler's challenge to the constitutionality of the parole process—which was the only claim he advanced in propria persona prior to the appointment of counsel—was designed to protect the rights of a large class of similarly situated prison inmates.

8

the Board need not set the base term for an inmate until after it has found the inmate not dangerous (i.e., suitable for release on parole). But, unlike the defendant in *Dannenberg,* Butler's challenge to the Board's former term-setting practice was based on *proportionality*, not uniformity, in sentencing. While uniformity is mandated by statute, proportionality is mandated by the cruel and/or unusual punishment provisions of the state and federal Constitutions. (*Dannenberg, supra,* 34 Cal.4th at p. 1096.)

The central issue in *Dannenberg* was how to reconcile the tension between the commands of subdivisions (a) and (b) of Penal Code section 3041. The Court of Appeal had determined that subdivision (a) —which provides that a "release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public" —took precedence over Penal Code section 3041, subdivision (b) —which provides that the Board "shall set a release date unless "consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed"—so that the parole board (then the Board of Prison Terms) "(1) *must first* compare the inmate's actual period of confinement with the minimum statutory confinement for the offense, and with the actual confinements served by others who have committed similar crimes, (2) *must* thereupon set a firm, 'uniform' release date unless it finds the public-safety exception applicable, and (3) *may not* deny parole, on grounds the commitment offense reflects a continuing threat to public safety, unless the offense is *particularly egregious* in comparison to others." (*Dannenberg, supra*, 34 Cal.4th at p. 1081.)

The Supreme Court disagreed, holding that "[t]he words of [Penal Code] section 3041 strongly suggest that the public-safety provision of subdivision (b) takes precedence over the 'uniform terms' principle of subdivision (a). The statute expressly provides that the fixing of a 'uniform' parole release date shall occur *unless* the Board finds the indeterminate life inmate unsuitable on grounds of 'public safety.' " (*Dannenberg*, *supra*, 34 Cal.4th at p. 1082.) Pointing out that the DSL treats life prisoners differently from determinately sentenced prisoners, and subdivision (b) of Penal Code section 3041 *does not say* that in evaluating suitability for release the parole authority "must consider

9

term uniformity in any respect" *(Dannenberg*, at p. 1083), the *Dannenberg* majority approved Board regulations specifying that, "when considering parole for a particular indeterminate life [prisoner], the Board shall *first* determine suitability and set a base term (thus establishing a parole release date) *if* the prisoner is deemed suitable for parole." (*Id.* at p. 1091, citing Regs., §§ 2402, subd. (a), 2403, subd. (a).)

*Dannenberg* thus stands for the proposition that dangerousness, or "public safety," trumps the uniformity in sentencing also prescribed by the DSL. The point the Board draws from *Dannenberg* is that the matrices used to set the base term do not measure the constitutional proportionality of a sentence, as Butler maintains, but simply indicate that a disparate sentence resulting from a denial of parole does not violate *the uniformity requirement* set forth in Penal Code section 3041. Because it sees the base term as a measure of uniformity, and *Dannenberg* says uniformity is subordinate to public safety, the Board reasons that determining whether a sentence is uniform or disparate before an inmate is found suitable for release is no more beneficial to the inmate than the prior practice of doing so afterward. Therefore, the Board believes that fixing the base term at the initial parole hearing, as it has agreed to do, does not result in the enforcement of a right and an award of attorney fees under section 1021.5 is unwarranted.

This reasoning makes a mockery of the settlement, is based on a far too limited reading of *Dannenberg,* and disregards the relationship between uniformity and proportionality in sentencing. Most importantly, it ignores the role the base and adjusted base terms play in promoting proportionality, which is both constitutionally mandated and an express goal of the DSL.

*Dannenberg* explained that although dangerousness trumps uniformity, it does *not* trump proportionality. The *Dannenberg* majority stated: "Of course, even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement, we have held, violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution." (*Dannenberg, supra,* 34 Cal.4th at p. 1096, citing *In re Rodriguez* (1975) 14 Cal.3d 639, 646-656 (*Rodriguez*) and *People v. Wingo* (1975) 14

Cal.3d 169, 175-183 (*Wingo*).) "Thus, we acknowledge, [Penal Code,] section 3041, subdivision (b), cannot authorize such an inmate's retention, *even for reasons of public safety*, beyond this constitutional maximum period of confinement." (*Dannenberg,* at p. 1096, italics added.) The Board conveniently ignores this portion of *Dannenberg*, but it is the part of the opinion Butler most heavily relies upon. While *Dannenberg* focused on the base term matrices as a measure of uniformity in sentencing,[5] nothing in the opinion suggests they do not also provide a basis upon which to analyze the proportionality of punishment resulting from the denial of parole.

As we shall explain, we agree with Butler that the base and adjusted base terms relate to proportionality, as well as uniformity, although we agree with the Board that the adjusted base term does not necessarily represent the maximum punishment that may constitutionally be imposed on a prisoner.

### B.

### *The Base and Adjusted Base Terms Relate to Both Uniformity and Proportionality*

The parties' conflicting contentions as to the purpose and effect of the prompt term-fixing required by the settlement and stipulated order boil down to (1) the question whether the base and adjusted base terms relate only to uniformity or to proportionality as well, and (2) the significance of whether the Board considers the bearing of uniformity and proportionality on the decision whether to grant a prisoner parole early in the parole process or only after the prisoner has been found suitable for release.

The Board's position is concisely summed up in the following provision of its regulations (which is *not* among the regulations referred to in the Stipulation and Order Regarding Settlement): "*Regardless of the length of time served*, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs., §§ 2402, subd. (a), 2422, subd. (a), italics added.) This declaration of authority is staggering.

---

[5] For example, the opinion refers to the Board's "own uniform-term 'matrices.' " (*Dannenberg, supra,* 34 Cal.4th at p. 1069.)

Blinding itself to the fact that, as *Dannenberg* acknowledges, there is a point at which any sentence will become constitutionally excessive if it is "grossly disproportionate" to the prisoner's individual culpability for the commitment offense, the Board rejects *any* limit on its authority to deny a prisoner release from prison based on its prediction that he or she presents a public safety risk.

As we shall see, the base and adjusted base terms relate to proportionality, as well as uniformity. But even if, as the Board says, they related only to uniformity, the settlement would confer a substantial benefit on life prisoners because uniformity remains an important purpose of the DSL even after *Dannenberg*. In determining *suitability for parole*, the Board is required by its own regulations to consider "[a]ll relevant, reliable information available" to it. (Regs., §§ 2281, subd. (b), 2402, subd. (b).) Since the DSL was designed to discourage disparate sentencing, the resulting uniformity or disparity of a sentence is surely "relevant" to the Board's parole decision. Whether the prison term resulting from a denial of parole would be disparate to terms imposed on others who committed the same offense in similar ways and circumstances is not reduced to irrelevance simply because it is not controlling. Moreover, prompt term setting would make the Board, other interested parties, and the public, aware of the extent to which the denial of parole led to disparate sentencing.

The effect of fixing of the base and adjusted base terms at the time of the initial parole hearing is to introduce uniformity in sentencing into the process of determining inmates' suitability for release on parole. Doing so promotes one of the two sentencing principles that inform the DSL and will advance its goals and benefit life prisoners. Accordingly, even if the settlement served only this purpose, it would confer a significant benefit warranting an award of attorney fees under section 1021.5.

In any case, it is clear that the base and adjusted base terms relate to proportionality as well. Uniformity and proportionality, the dual sentencing principles the Legislature thought best served the punitive purpose of the DSL (Pen. Code, § 1170, subd. (a)(1)), are conceptually related. The principles can conflict: Imposing the same sentence on all persons convicted of an offense would serve the purpose of uniformity,

12

but it would disserve the principle of proportionality, because no offense is always committed in the same circumstances and those who commit the same offense are not all equally culpable or blameworthy.  But the two sentencing principles usually do not conflict and in practice they are largely complementary.  Both are linked to retribution and both also serve the law's preference for discernible norms and enhance public respect for the criminal law and criminal justice systems, which is essential to the reduction of crime.  (Frase, *Punishment Purposes* (2005) 58 Stan. L.Rev. 67, 74-79.)  "[P]roportionality and uniformity of sentencing are based on widely shared fairness concerns, so highly disparate penalties are likely to reduce the public's willingness to obey the law and cooperate with law enforcement."  (*Id*. at p. 75; see also Hart, Punishment and Responsibility:  Essays in the Philosophy of Law (1968) p. 25 [if "the relative severity of penalties diverges sharply from this rough [proportionality] scale, there is a risk of either confusing common morality or flouting it and bringing the law into contempt"].)

The declaration in the first sentence of the DSL that "the purpose of imprisonment for crime is punishment" (Pen. Code, § 1170, subd. (a)(1) bespeaks a retributive theory of punishment.  But the statement is leavened by the declaration in the following sentence that the punitive purpose "is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders," which operates to limit the severity of the punishment that can be imposed.  Virtually all contemporary sentencing systems adopt some form of what has been referred to as "limiting retributivism" or a "modified just deserts" approach.  (Morris, Madness and the Criminal Law (1982) pp. 161, 182-187, 196-200.)  Punishment based *solely* on a retributive principle "leaves very little room for consideration of other punishment purposes, and no jurisdiction in the United States or elsewhere has ever adopted such a one-dimensional approach."  (Frase, *Punishment Purposes, supra*, 58 Stan. L.Rev. at p. 76; *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?* (2005) 89 Minn. L.Rev. 571, 589-593.)  The dual requirements of uniformity and proportionality clearly reflect a legislative desire to place limits on the

13

largely unmitigated retributivism that might otherwise result from a parole system governed solely by predictions of whether an inmate presented a threat to public safety. In the wake of *Dannenberg*, the only limitation that may be placed on the retributivism that can be visited on life prisoners through the systematic denial of parole is the constitutional prohibition of excessive punishment. The Board's position that it may deny a prisoner release on parole based on its determination that he or she presents a danger to public safety *"regardless of the length of time served" by the prisoner* (Regs., §§ 2281, subd. (a), 2402, subd. (a)) would remove *all* limits on the severity of punishment the Board can impose.

That the base term and adjusted base term relate to proportionality, and can serve as useful indicators of whether denial of parole will result in constitutionally excessive punishment, is evident in the fact that the matters considered by the Board when it sets the base term relate almost entirely to a prisoner's individual culpability for the base offense. It is also clear from the genesis of these concepts and the guidelines that define them, which were adopted by a former parole board precisely in order to measure constitutional proportionality during the parole granting process.

Under current regulations, the base term is "established *solely* on the gravity of the base crime, taking into account all of the circumstances of that crime."[6] (Regs., § 2403, subd. (a), italics added.)[7] The manner in which calculation of the base and adjusted base

---

[6] If the prisoner has been sentenced for more than one murder, the "base crime" is the "most serious of the murders considering the facts and circumstances of the crime." (Regs., § 2403, subd. (a).)

[7] The existing Board regulations specify different parole procedures and considerations for different categories of prisoners, and determining the regulations applicable to a given case can be challenging. Prisoners who, like Butler, were sentenced for first or second degree murders committed on or after November 8, 1978, or for certain types of attempted murder, are governed by title 15, division 2, chapter 3, article 11 (§§ 2400-2411). (Regs., § 2400.) Parole for life prisoners whose crimes were committed before July 1, 1977, is governed by "rules in effect prior to 7/1/77." (Regs., § 2292.) The regulations applicable to life prisoners whose offenses were committed after July 1, 1977, and before November 8, 1978, as well as those whose offenses do not put them within the purview of article 11, are governed by article 5 (§§ 2280- 2292 of tit. 15). (Regs.,

14

terms takes the circumstances of the commitment offense into account can be illustrated by using Butler's crime, second degree murder, as an example.

The matrix of base terms for this offense, which carries a term of 15 years to life, prescribes sentence triads ranging from 15-16-17 years to 19-20-21. The horizontal axis of the matrix applicable to second degree murder relates to the manner in which the inmate murdered his victim, dividing culpability into three categories: (1) cases in which the victim died of causes only indirectly related to the prisoner's act (as where a crime partner actually did the killing), (2) cases in which death was directly caused by the prisoner but the victim contributed (as by goading the prisoner), and (3) cases in which death resulted from severe trauma inflicted by the prisoner with deadly intensity. (Regs., § 2403, subd. (c).) The vertical axis of the matrix for second degree murder relates to the relationship of the prisoner to his victim and also divides culpability into three categories: (1) the victim was an accomplice or otherwise implicated in the commission of the prisoner's base offense; (2) the victim was involved in a personal relationship with the prisoner, such as a spouse or friend, which contributed to the motivation for the act resulting in death; and (3) the prisoner had little or no personal relationship with the victim or the motivation for the criminal act was related to the commission of another crime, as where the victim was killed by the prisoner in the course of a robbery. The Board panel must "determine the category [on each axis] most closely related to the circumstances of the crime" and must "impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation." (Regs., 2403, subd. (a).)

The "adjusted base term" refers to additional terms, or "enhancements," the Board may impose for using a deadly or dangerous weapon, being armed with or using a

_____

§§ 2292, 2400.) The provisions of articles 6 (§§ 2300-2310) and 7 (§§ 2315-2329) apply to ISL prisoners. (Regs., § 2300.) Article 12 (§§ 2420-2429.1) governs parole procedures for habitual offenders sentenced to life terms and article 13 (§§ 2430-2439.1) applies to sex offenders sentenced to life terms. Among other things, the regulations set forth different base term matrices for the different categories of prisoners. (Regs., §§ 2282, subd. (b), 2329, 2403, subd. (b), 2423, subd. (b).)

firearm, causing "great loss," serving prior prison terms, or for the concomitant commission of "other offenses." (Regs., §§ 2285, 2286, 2406, 2407.)[8] Such additional terms may in turn be increased or lowered for enumerated aggravating or mitigating circumstances relating to "other crimes." (Regs., §§ 2287, 2288, 2408, 2409.)[9]

Focusing on the particular circumstances of the commitment offense and the offender at the time it was committed, the regulations make clear that the base term is meant to reflect individual culpability. Individual culpability, as we have discussed, is the measure of proportionality. (*Dannenberg, supra,* 34 Cal.4th at p. 1096.)[10] In

---

[8] The factors that may later serve to reduce the base term, such as credit for presentence custody and prison conduct (Regs., §§ 2290, 2410), are based on circumstances occurring after commission of the base crime and are therefore unrelated to proportionality analysis.

[9] Thus, for example, aggravating factors permitting the Board to increase the additional term include commission of other crimes in which "[a] victim was seriously injured or killed in the course of the other crime," "the other crime was part of a series of crimes which occurred during a single period of time," the other crime "indicates a significant pattern of increasingly serious criminal conduct," "[t]he other crime was one of a series of crimes which occurred during a single period of time," the prisoner committed multiple crimes indicating "a significant pattern of criminal; behavior rather than a single period of aberrant behavior," "[t]he prisoner was on probation or parole or was in custody or had escaped from custody when the crime was committed," or "[t]he victim was particularly vulnerable." (Regs., § 2408. subds. (a)-(f); see also Regs., § 2287, subds. (a)-(e).) The mitigating factors allowing the Board to lower the additional term include successful completion of probation or parole, "an insignificant pattern of prior criminal behavior," "the prisoner was granted probation after conviction of the other crime." (Regs., § 2409, subds. (a)-(c); see also Regs., § 2288, subds. (a)-(d).)

[10] The concept of proportionality, which has roots in the Old Testament (Exodus 21:23-24 (King James)), rests on the moral proposition that it is just to punish a wrongdoer by inflicting on him a type and degree of harm comparable to that he or she inflicted on the victim. Because the biblical concept of punishment—"an eye for an eye," or *lex talionis*—was based only on the injury suffered by the victim and ignored the circumstances in which it was inflicted, the concept of punishment came to be seen as morally questionable as early as the eighteenth century. As Blackstone said, "the difference of persons, place, time, provocation, or other circumstances, may enhance or mitigate the offense; and in such cases retaliation can never be a proper measure of justice." (4 Blackstone, Commentaries on the Laws of England (1769) at p. 13; see also Beccaria, On Crimes and Punishments (Henry Paolucci trans., 1963) (1768).) As a result,

determining whether a sentence is cruel or unusual as applied to a particular offender, " 'a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed and the consequences of the defendant's acts.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, at p. 1426, quoting *People v. Dillon* (1983) 34 Cal.3d 441, at p. 479.) These are precisely the considerations focused upon by the base term matrices and other directives regarding calculation of the base and adjusted base terms. Thus, while the Board's matrices and associated directives and adjustments promote uniformity by applying the same yardstick to all inmates who have committed the same crime for similar purposes in similar circumstances, it is absurd to think the base and adjusted base terms are not also measures of proportionality.[11]

The history of the base term concept underscores this point. Prior to enactment of the DSL, under the Indeterminate Sentencing Law (ISL), the parole authority was empowered both to fix a prisoner's actual maximum term and to grant earlier parole. (*Dannenberg, supra,* 34 Cal.4th at pp. 1096-1097.) In *Rodriguez,* the California Supreme Court condemned the parole authority's practice of deferring setting of a maximum term until the prisoner was deemed ready for parole, which failed to ensure prisoners would be

---

the formulation of proportionality evolved over time into a broader inquiry about culpability; that is to "the proportionality between the crime or *offense*—a concept that includes the mental state of the wrongdoer, other circumstances of the crime, and the victim's injury—and the punishment." (Balmer, *Some Thoughts on Proportionality* (2008) 87 Oregon. L.Rev. 783, 786, 791, fn. 35; accord, Model Penal Code: Sentencing § 1.02(2)(a)(1) [first "purpose" of the sentencing provisions is "to render sentences in all cases within a range of severity proportionate to the gravity of sentences, the arms done to crime victims, and the blameworthiness of offenders"].)

[11] As a Justice of the Oregon Supreme Court has observed, the rationality and proportionality promoted by matrices and related sentencing guidelines similar to those in the Board regulations (and specified in the settlement and stipulated order) "were undermined in the 1990's by the widespread adoption of 'three strikes you're out' provisions . . . and mandatory minimum sentences for many specific offenses . . . [which] often were adopted without regard for the gradations established in the existing sentencing guidelines." (Balmer, *Some Thoughts on Proportionality*, *supra*, 87 Or. L.Rev. p. 792, fn. 41.)

subjected to terms "proportionate to their individual culpability" (*Rodriguez, supra,* 14 Cal.3d at p. 650), and required it to promptly "set a maximum term for every indeterminate sentence, tailored to his or her individual culpability." (*Dannenberg,* at p. 1097; *Rodriguez,* at pp. 650-653.) In order to avoid unconstitutional disproportionate punishment, the fixed maximum term (referred to as the "primary term") was required to be based on "the circumstances existing at the time of the offense," while the decision to grant earlier parole was based largely "on occurrences subsequent to the commission of the offense." (*Rodriguez,* at p. 652.)

In response to *Rodriguez*, the Adult Authority adopted regulations applying its requirements to prisoners sentenced to indeterminate life terms under the DSL. These regulations (former 15 Cal. Admin. Code, §§ 2000-2725 (1976 Regs.)) required the setting of a "primary term" shortly after an inmate entered prison, and defined that term as "*the maximum period of time which is constitutionally proportionate to the individual's culpability for the crime.*" (1976 Regs., § 2100, subd. (a), italics added.) Under the regulations, the primary term consisted of a "base term" reflecting the circumstances of the crime pertinent to the inmate's culpability, and "adjustments for the individual's criminal history (prior prison terms and current commitments). (*Id*. at § 2150.)[12] Thus, the original purpose of the base term concept was to establish the constitutional limit of punishment by reference to proportionality.

---

[12] The 1976 regulations provided suggested ranges of punishment for a given crime, with alternatives depending on whether the Adult authority characterized the crime as a mitigated, typical or aggravated crime of that type, and suggested adjustment ranges. (*Id*., §§ 2151, 2152, 2225, 2226.) Once fixed, the primary term could not be "refixed upward" unless the term was illegally fixed, a clerical error was made, or significant information was fraudulently withheld from the parole board." (*Id*., § 2102, subd. (a).)

The 1976 regulations derived from a directive issued by the Director of the Adult Authority on September 2, 1975, about two months after *Rodriguez* was decided, entitled "Implementation of Rodriguez." (Chairman's Directive No. 75/30). Under the Directive, the setting of the primary term could be based only on information pertaining to the inmate's culpability for the commitment offense, past history and personality could be considered, but not information relating to conduct "subsequent to the offense." (*Id*., § IV.A.) The Directive stated that because prior to Rodriguez inmates' terms could be re-

The current Board's past practice of deferring the setting of base and adjusted base terms until an inmate was found suitable for parole meant that neither uniformity nor proportionality were considered until an inmate was deemed ready for release. Although the DSL provides that the Board "shall normally set a parole release date" for life prisoners prior to the inmate's initial parole hearing (Pen. Code, § 3041, subd. (a)), it is common knowledge among all familiar with the Board's administration of the parole system that this almost never happens. A 2011 study found that life prisoners, who due primarily to their age when they become eligible for parole have a "miniscule" rate of recidivism, were granted parole during the studied period at only 2.2 percent of initial parole hearings and at less than 15 percent of all subsequent hearings. (Weisberg et al., *Life in Limbo: An Examination of Parole Release for Prisoners Serving Life Sentences with the Possibility of Parole in California*, Stanford Criminal Justice Center (September 2011) at p. 18) (*Stanford Study*) The *Stanford Study* also examined the result of subsequent parole hearings afforded 239 inmates who, like Butler, were convicted of second degree murder. Of that group, 195 (81.6 percent) were denied parole and only 44 (18.4 percent) were granted parole. The average time already served by all 239 inmates at the time of the hearing was 20.1 years. (*Stanford Study*, Chart 14, at p. 20.) Twenty years is the midterm specified by the most aggravated sentence triad applicable to second degree murder, which is appropriate only in the extreme situation in which the prisoner inflicted severe trauma "calculated to induce terror in the victim" with whom he has "little or no personal relationship." (Regs., § 2403, subd. (c).)

Assuming the Board would not knowingly subject inmates to disproportionate sentences, it is logical to conclude that the high rates of parole denial resulted in significant measure from the fact that the Board's former practice did not consider the

fixed based on events subsequent to the commitment offense, some inmates were currently "serving terms disproportionate to the commitment offense, based on their subsequent history" and would be "entitled to discharge under the new procedures." (*Id.*, § V.F.; see also Cassou & Taugher (1978) *Determinate Sentencing in California: The New Numbers Game*, 9 Pac. L.Rev. 5, 16.)

19

uniformity and proportionality of a sentence *until after it had been imposed* by a grant of release. The *Stanford Study* thus indicates that the Board's failure to promptly fix terms and consider uniformity and proportionality during the process of determining suitability for release on parole resulted in the denial of parole to many prisoners who had already been serving sentences which, under the Board's own criteria, were both disparate and disproportionate.[13]

The settlement and stipulated order will rectify or at least diminish this and other problems attributable to the Board's former policy and practice. As discussed in *Rodriguez*, prompt term-fixing will not only alleviate the uncertainty and anxiety of prisoners, which is a cause of violence and a disincentive to rehabilitation, but reduce the likelihood that the postconviction factors that formerly dominated the determination of punishment will result in disproportionate sentences. (*Rodriguez, supra*, 14 Cal.3d at p. 654, fn. 18.) Given the Legislature's declaration that the purpose of imprisonment in this state—namely, "punishment"—"is best served by terms proportionate to the seriousness of the offense" (Pen. Code, § 1170, subd. (a)(1)), this is no small achievement.

Further, as also discussed in *Rodriguez,* the prompt determination of base and adjusted base terms to which the Board has agreed will facilitate judicial review. (*Rodriguez, supra,* 14 Cal.3d at p. 654, fn. 18.) Whether the punishment imposed on a particular prisoner is constitutionally excessive is of course ultimately for the courts to decide, not the Board. Unlike the 1976 regulations promulgated in response to *Rodriguez*

---

[13] Indeed, this appears to have happened in Butler's case. At the time he filed his supplemental habeas corpus petition in 2013, Butler had been incarcerated for 26 years and been eligible for parole since 1998, i.e., for 15 years. At his last parole hearing— which was conducted on April 25, 2014, after we had set aside the Board's fifth denial of parole—Butler was granted parole and the Board then calculated his base term to be 17 years and awarded him 82 months of postconviction credit. Thus, when at his sixth parole hearing, the Board finally measured Butler's individual culpability for the commission of his life offense he had already served almost a decade longer than required by his base term—even without taking into account the nearly seven years of postconviction credit by which his term was reduced.

20

(see discussion, *ante*, at p. 14), the Board regulations specified in the settlement and stipulated order as governing establishment of the base and adjusted base terms (cited, *ante*, at p. 3, fn. 3) do *not* indicate that the base and adjusted base terms the Board promptly fixes for a particular prisoner constitute the Board's estimate of the maximum prison term constitutionally proportionate to that prisoner's culpability for his or her base crime. Nor do any of the specified regulations prohibit the Board from refixing a base or adjusted base term. Nevertheless, the base and adjusted base terms represent an approximation of the punishment the Board deems proportionate to the particular prisoner's offense. Having those terms set promptly therefore will greatly strengthen life prisoners' ability to present claims of constitutionally excessive punishment.

A reviewing court can most usefully analyze a life prisoner's claim that the denial of parole results in a cruel and/or unusual punishment after the parole authority has established a term that can be subjected to judicial review. Drawing again on *Rodriguez,* "[w]ere unrepresented prisoners required to take the initiative by seeking relief at such time as they believed their continued imprisonment to be constitutionally impermissible, not only might abuses such as that in the instant case . . . recur, but courts would continue, as now, to receive inadequate petitions unaccompanied by necessary supporting data. Since prison inmates understandably lack perspective as to the propriety of their continued incarceration, and also lack the ability to marshal the facts and applicable law in support of their claims, it is probable that courts would be burdened by a flood of meritless petitions. Each inmate would seek relief . . . when denied parole and/or term-fixing by the [parole authority] in the hope that the court would agree that he had been imprisoned for a sufficient length of time. Once the primary term is fixed by the [parole authority], however, all of the relevant data regarding the particular inmate, the circumstances of his offense, and the criteria upon which the term is based will have been marshaled by the [parole authority], thus enabling petitioner to set out the basis or bases for his complaint, while at the same time providing the court with a record adequate to permit meaningful review." (*Rodriguez, supra,* 14 Cal.3d at p. 654, fn. 18.)

21

Under the stipulated order, prisoners like Butler repeatedly denied parole after having served their adjusted base terms would at least be able—as they formerly were not—to credibly represent to a reviewing court that the denial of parole resulted in the imposition of punishment that so exceeds his or her culpability that it is constitutionally excessive.

For the foregoing reasons, we reject the Board's view that fixing the base and adjusted base terms at the outset of the parole process will not "substantially benefit" life prisoners. We conclude that the order stipulated to by the parties to enforce the terms of their settlement confers a significant benefit on a large class of persons.[14]

## II.

### The Amount of Fees Sought by the Motion is Not Reasonable

As stated at the outset of this opinion, Butler seeks fees in the amount of $439,000, which we believe excessive and unreasonable. Because this matter is an original proceeding in this court, we are unable to follow the usual practice of remanding the request for fees to the court in which the trial was held for the purpose of taking evidence on, and fixing, the reasonable amount of fees to be awarded under section 1021.5. (See *Mack v. Younger* (1980) 27 Cal.3d 687, 689; *Serrano v. Priest*, *supra*, 20 Cal.3d at p. 50.) Accordingly, as we did in *Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1202, and as other appellate courts have done (see, e.g., *Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 191), we invite the parties to agree within 20 days as to the appropriate amount of costs and fees. If the parties are unable to agree, this court will decide the matter on the basis of the declarations and other evidence pertaining to the reasonable amount of fees the parties have submitted to us. The parties should know that while the members of this panel are not currently in agreement as to the specific amount of a reasonable fee, all agree it is somewhat less than half the amount requested.

---

[14] As we have indicated, this is the only aspect of entitlement to fees under section 1021.5 the Board has challenged.

22

## DISPOSITION

Butler's request for attorney fees is granted. The parties are ordered to meet and confer in an attempt to come to an agreement as to the precise amount to which Butler is entitled. No more than 20 days from the date of this ruling, the parties must inform this court in writing whether they were able to reach an agreement. If the parties were not able to agree, the court will decide the matter of the basis on the declarations and other evidence that has been submitted.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*In re Butler* (A139411)

Trial Court:                                    Alameda County Superior Court

Trial Judge:                                  Hon. Larry J. Goodman

Attorneys for Petitioner:            Keker & Van Nest LLP
Under appointment by the Court of Appeal
Jon B. Streeter
Susan J. Harriman
Sharif E. Jacob
Benita A. Brauhmbhatt

Attorneys for Resondent:           Office of the Attorney General
Kamala D. Harris
Attorney General of California
Jennifer A. Neill
Senior Assistant Attorney General
Claudia H. Amaral
Supervising Deputy Attorney General
Amber N. Wipfler
Deputy Attorney General