Filed 7/26/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re WILLIAM M. PALMER,<br><br>    on Habeas Corpus. | A147177 |

**INTRODUCTION**

In 1988, when he was 17 years old, petitioner William Palmer pled guilty to kidnapping for robbery.  Sentenced to life with the possibility of parole, Palmer has come before the State of California Board of Parole Hearings (Board) 10 times, without success.  The most recent hearing was on June 2, 2015, when the Board denied parole, with a five-year denial, expressly rejecting Palmer's request at the conclusion of the hearing to calculate his base term and adjusted base term.

On August 21, 2015, represented by counsel from the same firm that has represented him since 2008, Palmer requested reconsideration pursuant to California Code of Regulations, title 15, sections 2028, subdivision (b), 2041, subdivision (h), and 2042, on the grounds the Board had:  (1) wrongfully refused to set a base term and an adjusted base term for Palmer's commitment offense, and (2) applied the incorrect standard at Palmer's parole hearing by failing to give great weight to the youth offender factors.

By letter of September 21, the Board denied Palmer's request for reconsideration, stating that the Board had given appropriate weight to the youth offender factors at Palmer's hearing.  The letter did not address whether Palmer was entitled to have his base

1

term and adjusted base term set, promising that the Board's "response to this issue will be addressed in a separate letter." No such letter was forthcoming.

On December 31, Palmer filed an original petition in this court, filing it here based on the stipulation and order regarding settlement filed in the *Butler* case. (*In re Butler* (2015) 236 Cal.App.4th 1222, 1234 (*Butler*) ["This Court shall retain jurisdiction of this case until the amended regulations, conforming to the base term setting practices as described in this order, become effective."].)

We requested informal response, which the Attorney General filed on May 16, 2016. In that response, the Attorney General defended the Board's conduct, including its failure to calculate and consider base terms, arguing that the *Butler* settlement did not apply to Palmer because he was a youth offender, and that the Board's decision to deny parole comported with the requirements of the youth offender statute. Palmer filed a reply, asserting that the Board's refusal to set terms was contrary to the *Butler* settlement.

On December 8, we issued an order to show cause. Six days later, the Board calculated Palmer's base and adjusted base terms. The Attorney General thereafter filed a return, arguing that the claim based on *Butler* was moot, that the hearing complied with the law, and that denial of parole was supported by "some evidence." Palmer filed a traverse, following which we held oral argument.

We now render our opinion, holding that the June 2, 2015 hearing did not comport with *Butler*, and order the Board to conduct a new hearing in light of the terms it now has set for Palmer.

## BACKGROUND

### Palmer

Palmer was born and raised in Riverside, the younger of two children born to his parents. He has two half-brothers and three half-sisters, as both parents had been married before. Palmer's father moved out of the home when Palmer was approximately eight. As Palmer described it, until his father left the home, they lived in a close-knit neighborhood in a relatively supportive community. After his father left, they moved

2

into a more middle class community, at which time Palmer realized that his family was not that well off—and he became more materialistic.

As Palmer approached high school, he began his criminal activity, his first offense in July 1985 when Palmer admitted to the violation of driving without a license. In February 1986, Palmer admitted to a violation of Penal Code section 288a, a felony, for his conduct with three minors.[1] Palmer was placed on probation, and then violated it with two charges of robbery, burglary, and attempted burglary.

Palmer's criminal activity culminated with the commitment offense in 1988, when, his face covered with a ski mask, he lay in wait in a parking garage in an apartment complex with which he was familiar (having previously committed burglaries there). Brandishing an unloaded .357 revolver he had stolen in a previous burglary, Palmer confronted Randy Compton, and ordered him to turn over his wallet. Compton said he did not have one, and Palmer ordered him to drive to an ATM and withdraw $200. When they arrived at the bank, Compton, an off-duty police officer, drew his gun and fired 15 rounds at Palmer, who was hit in the knee and fled. Palmer was captured shortly thereafter, waived his *Miranda* rights, and confessed to the crime, an account fully corroborated by Compton.

**Palmer's Prison Experience**

Palmer has been incarcerated since 1988, during which time he has had 10 parole hearings, including that leading to the petition here. Palmer's petition asserts that "At many of his prior parole hearings, the Board has applauded Mr. Palmer's rehabilitative efforts, his indisputable psychological health, and the superlative references he has received from those prison officials and employees who know him best. For example, as early as 1997, the Board quoted a letter from a vocational instructor who wrote that Mr. Palmer 'has the best chance to succeed out of any of the many students I've met.'

---

[1] Though he pled guilty to the Penal Code section 288a allegation, Palmer insisted at the hearing he was not guilty of the crime, going on to explain the circumstances of his plea.

3

(Ex. G, Excerpt from Tr. of Aug. 19, 1997 Parole Consideration Hearing, at App. 169.)"
That quotation is the only support provided.

The ninth parole hearing, the one prior to the subject hearing, was on April 11, 2013, where the Board denied parole, focusing primarily on Palmer's violations while in prison, violations described as reflecting "serious misconduct while incarcerated." The denial was for five years. Palmer was successful in having that time advanced, and, as indicated, his next hearing, that involved here, came on some two years later, on June 2, 2015.

In the interim, two things occurred that Palmer contends would affect his hearing: (1) the settlement in the Roy Butler matter, and (2) the amendment of Penal Code section 3041. We thus digress from Palmer's prison history to discuss these developments.

***Butler***

Prior to 2012, the Board's practice was to defer setting a prisoner's base term and adjusted base term until after it had found him suitable for release, reasoning that the term calculations were irrelevant where a dangerousness determination precluded parole. (*Butler*, *supra*, 236 Cal.App.4th at p. 1234.) Butler filed a petition challenging that policy, arguing that it violated the due process rights guaranteed by the California and United States Constitutions and that it obstructed judicial review of claims that the denial of parole had resulted in constitutionally excessive punishment. (*Id.* at p. 1228.) The Board settled the case by entering into a settlement agreement, a settlement this court approved and incorporated into a December 16, 2013 order. As pertinent here, the settlement obligated the Board to implement "new policies and procedures that will result in the setting of base terms and adjusted base terms for life time inmates at their initial parole consideration hearing, or at the next scheduled parole consideration hearing that results in a grant of parole, a denial of parole, a tie vote, or a stipulated denial of parole."

The terms of the *Butler* settlement became effective on March 5, 2014, and on April 1, 2014, the Board changed its policy on the calculation of base and adjusted base terms in response to the requirements of the settlement. The Board, however, took the

4

position that the settlement provisions did not apply to juvenile offenders, which, as will be seen, was the Board's position at the June 2015 hearing.

**The Youth Offender Law**

In Senate Bill 260, the Legislature in 2013 amended the Penal Code regarding parole hearings for youthful offenders who were under 18 at the time of the commitment offense. (See Sen. Bill No. 260 (2013–2014 Reg. Sess.) Sept. 2013, pp. 2520–2522; see also Pen. Code, §§ 3046, subd. (c), 3051, 4801, subd. (c).) While the hearings were to be conducted under the same general guidelines as hearings for non-juvenile offenders (see Pen. Code, §§ 3041, 3051, subd. (c)), the bill also provided that the Board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (Pen. Code, § 4801, subd. (c).) The bill was enacted out of recognition that "youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Sen. Bill No. 260, supra, § 1.) The Legislature's intent was "to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (*Ibid*.) In sum, to provide youth offenders such "meaningful opportunity for release," Senate Bill 260 requires the Board to "give great weight" to three specific factors in reviewing a youth offender's suitability for parole. (Pen. Code, § 4801, subd. (c).) These three factors, which are drawn from *Graham v. Florida* (2010) 560 U.S. 48 and *Miller v. Alabama* (2012) 567 U.S. 460, are "the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner . . . ." (Pen. Code, § 4801, subd. (c).)

**The June 2, 2015 Hearing**

Palmer's June 2, 2015 parole hearing came on following Palmer's successful motion to advance. The hearing was before two commissioners: Presiding Commissioner Arthur Anderson and Deputy Commissioner Kathleen Newman. Palmer

was present, represented by attorney Megan Havstad of the firm of O'Melveny & Myers, a prominent California law firm that has apparently represented Palmer on pro bono basis since 2008. Riverside County Deputy District Attorney was also present. The hearing lasted some three and a half hours, and generated a transcript of 127 pages.

The hearing began with various preliminary matters, including the presiding commissioner's observations that the hearing was held in light of the youth offender law and its effect. Following those preliminaries, the presiding commissioner referred to various submissions from Palmer. Commenting on one such submission, the commissioner observed: "Okay. You've remained disciplinary-free. You still disciplinary-free?" Palmer answered, "I am." It would develop that Palmer's representation was not true, a fact that led to much discussion at the hearing.

One last development before the commissioners turned to the specifics of Palmer's record in prison. The deputy commissioner's referred to the 2013 hearing, at which Palmer had received a five-year denial. The deputy commissioner asked Palmer how he felt about that. This colloquy ensued:

"INMATE PALMER: I wasn't happy, but I deserved it. I have two 115s coming in here. I knew that I still had some work to do.

"DEPUTY COMMISSIONER NEWMAN: Okay. That was the primary reason for your denial. The very first reason was serious misconduct while incarcerated. They noted you had ten 115s. You have 11 now. The last Panel had told you to stay disciplinary-free, but you didn't. You minimized your prior criminality. They thought that they saw the same ongoing pattern. The Risk Assessment wasn't supportive in that you hadn't internalized any of the concepts of self-help. So kind of sounds like that last Panel really kind of nailed it.

"INMATE PALMER: Yes.

"DEPUTY COMMISSIONER NEWMAN: Did you see that at the time?

"INMATE PALMER: No, ma'am, I didn't. Every Panel that I came in, I left thinking they don't—they didn't get it right. You know, they just—you know, it was, it was always an adversary. It was you against me, you know? And it wasn't until recently

6

that it's not about you, and it's not about us against them or me against you. Ms. Newbill helped me go through my transcripts. She actually highlighted some things and sent them to back to read, and we talked about them. She said they're telling you exactly right here what you need to work on. It's not a mystery. Why can't you get it?

"DEPUTY COMMISSIONER NEWMAN: Right.

"INMATE PALMER: And it was at that time that I started to get it. And, today, I don't see you as my adversary or staff. We [are] on the same team. We want to make sure that the public is safe from me, from my decision making."

The reference to "Ms. Newbill" was to Alicia Newbill, a person Palmer had met via a mutual friend in November 2013, and who was described at the hearing sometimes as Palmer's girlfriend, and sometimes as his fiancée. And Alicia Newbill, and what she did for Palmer—and what she meant to him—became a significant subject at the hearing, particularly in reference to a May 7, 2014 incident involving Newbill that led to discipline for Palmer, which incident will be described in detail below.

While in prison, Palmer, a high school dropout, had obtained a GED and in 2007 an AA degree from Palo Verde College. As the deputy commissioner described it, Palmer had done a "really good job" with his educational upgrade.

With regard to self-help, Palmer was described as "working steadily," his volume of progress "just fine." Indeed, Palmer has participated in a range of self-help programs, including substance abuse and victims' impact programs included in the "Long-Term Offender Pilot Program"; courses on conflict resolution and anger management; faith-based self-improvement programs; Narcotics Anonymous; and the "Criminal Gangs and Violence Prevention Program." Palmer also contributed to the prison community, including tutoring other youth offenders, volunteering as an inmate peer health educator, and participating in the "Visiting Beautification Project."

Palmer's parole plans were discussed at length, and were satisfactory. He had plans on where he would live initially, with his ultimate plan to move to Washington State, to be with the Newbill family.

The Board had many letters in support of Palmer, including from his sister, his cousin, and his uncle. There was a letter from a person who volunteered to be Palmer's AA sponsor. There were at least three letters from people who had known Palmer since elementary school. And there were letters from three members of the Newbill family: Alicia, her father, and her brother. Mr. Newbill, who had met Palmer in prison, spoke highly of Palmer's character. So did Alicia's brother, a painting contractor who also said he was willing to offer Palmer a job.

Palmer learned to paint in prison, and joined in "Arts in Corrections," where he has been off and on for 10 years. He has become quite an accomplished artist: he has sold some of his art work, and has also painted three murals on the prison grounds, one of which the deputy commissioner described as "very beautiful," another of which the presiding commissioner described as "very good work."

Finally, there was discussion of the recent assessments, including one dated October 2014 by M. Geca, Psy.D., who opined that Palmer represents a "*moderate* risk for violence." Among other things, the presiding commissioner quoted Dr. Geca's report: " 'The undersigned has seriously considered a low risk for Mr. Palmer given his developing insight in the errors. However, despite having provided with repeated feedback by the Panel and mental health doctors, he continued to engage in institutional misconduct. In fact, he's incurred three additional Rule Violations since the last time he was evaluated by this undersigned . . . and the last one was 2014. . . . Failure to curb these behaviors, unfortunately, has necessitated a slight increase of your previous level of risk from a low-moderate to a moderate."

Dr. Geca's risk of future violence assessment included this: "It is this undersigned['s] opinion that Mr. Palmer has yet to explore sufficiently not only his narcissistic outlook on life but also his defiance and his oppositional behaviors. In this interview, he attributed them to having been wrongfully convicted when he was a 15-year-old, or to having been forced to accept the plea[], and to his reaction toward, what he perceived to be[], an unfair justice system. Yet, his defiance and opposition were evidence during his earlier years when he stole things, engaged in fights at school and

8

while having been defiant toward his coach. His performance on the Court supervision was inadequate; he resisted feedback and was not amenable to change for many years to come. This resistive, oppositional and defiant attitude continued at CDCR and despite his rather recent but candid appraisal of his character flaws and negative attitudes, he is yet to sufficiently address and to resolve these concerns. When left unresolved, this personality style and ways of relating to others will likely hinder him in interpersonal contacts and may exacerbate his stressors related to the reintegration process."

Another evaluation was by Dr. Paul Good, prepared in December 2014. Dr. Good's report referred to Palmer's work in the "Man Up" program having an effect on the "self-defeating behavior that he had previously brought into contact with prison authorities." Asked what self-defeating behavior Dr. Good was referring to, Palmer answered, "I was stuck in my denial. And every time I was making decisions, I was making decisions for selfish reasons and gangs, working off my impulses and emotional responses." And he elaborated: "And until I really started to understand what it is to be a man, to have integrity, to be honest, to be forthcoming, to be accountable and responsible, I was stuck in my prison mentality. It was a mentality that I learned at a very early age in order to survive the Level IVs and Level IIIs. And because I was able to survive that, I didn't feel I needed to change anything. It worked for me, and it was no longer working for me."

Early in the hearing, Palmer had talked of how he stopped going to church with his family, and that while he figured some things out, the "one thing I did not address was my emotional state. How I was really feeling or really what's causing me to do things. And it took 26 years for me to finally pay attention to what that was." Palmer was asked what took so long. This colloquy followed, with its focus on May 7, 2014:

"INMATE PALMER: Honest, I just—I wanted to just feel like there was nothing else needed to be done. I wasn't willing to really look deep inside myself to go deep and figure out what the causative factors really was. I was satisfied with the stride that I had made, and that was good enough. And I'm going to do my time and get out and move on. And if it wasn't for May 7th, I was still being 16 villain, still being a selfish and

9

inconsiderate and reckless and breaking the rules. That event right there really opened my eyes to what I was doing and the changes that I needed to make. If it wasn't for listening to Alicia's crying and telling me what I did that day, it wouldn't made no difference. It wouldn't have made a bit of difference to me.

"PRESIDING COMMISSIONER ANDERSON: You were only 17 years old at the time. Were you under the influence of anything on that day?

"INMATE PALMER: Marijuana. I was practically high every day all day, but that's no excuse for what I did because I made [the] decision to get high. And while I was high, I made the decision to go out and rob somebody, anybody that came into my vicinity.

"PRESIDING COMMISSIONER ANDERSON: And how have you addressed the substance abuse issues?

"INMATE PALMER: Since the beginning I came to prison, I've taken 12-step programs. When I went to YTS, I volunteered to go to the WNX, which was a in-house 12-step program. Truthfully, I didn't take it all that serious, or I didn't fulfill it as I should have. And it took me 26 years for me to finally start to relieve some of the angry [*sic*] and the resentment that I was holding. I blamed my mom for not being there all the time. I blamed my father for not being there. I blamed my teachers for kicking me out of school. I blamed the authorities for locking me out in prison. I never blamed me for anything. I never blamed me for the things that I was doing, for robbing people or hurting people. But after May 7 when I went to NA and . . . [w]e were talking about resentment and anger, and it was just a breakthrough right there. It was finally just like I have no reason to resent anybody in my life. Everybody has a reason to resent me. I've done all of this."

Time and again, Palmer would refer to May 7, 2014 as a critical point, describing it in various ways, including these: "[F]rom May 7th, 2014, . . . I've changed who I was and how I thought and how I behave." "But after May 7, I realized it's not about relationships. It's about my whole entire life. Every aspect in my life. And that's when it hit, it hit home. And I went to saw [*sic*] Dr. Smith, who's a psychologist. We had

10

talks. And I begged, I begged my groups and them to really get me to understand. And when me and Alicia started processing over the phone for months and months, it was just the way that we talked to each other that I started to really understand that it was about having integrity all the way every day through everything that I do. And that's what really hit home. And once I started practicing that mentality, that state of mind, everything changed. I mean, literally, the staff, the way they treated me changed. The way other inmates approached me and dealt with me. And I don't think her father would've came down here to visit and then left and came back if I didn't make those changes. And I see it today in myself. To really be able to say why it took so long, I wish it took sooner. Trust me. I would've loved to have made these changes sooner, but it came when it came."

And finally, later in the hearing, there was this: "There is absolutely no excuse for breaking the rules. . . . I was making terrible decisions, and I wasn't capable of making rational decisions because I was undermining my punishment each and every time I decided to act on my impulses. Sometime it take a moment. Sometime it takes an event in life to really wake you up, and I was living in denial for 26 years. . . . If you notice out of all the crimes that I've committed and all of the Rule Violations I committed, I've never asked for help. I never tried to change. But since May 7th, I made a commitment. I made a physical change, a mental change, and a spiritual change. Ms. Newbill, the reason why she's important to me, it's because there's another thing that she said to me. How are you being a Muslim and being deceptive? . . . . She just brought up so many points about my hypocrisy of who I was saying I was, and that touched me and that hit home hard. Those are the reasons why I made the change, but she is not the reason why I'm going to stay changed. If she leaves me today because she's free to go at any time she wants, I am not going to change my reason for what I do today, for who I am today. I invented an ego, a mindset when I was nine years old. And he came in to protect me, to give me what I wanted, to do whatever I needed him to do. And that was me, but today I've been able to shrink him down. I've been able to manage my own life now. I've been able to make my own decisions."

11

Following a break, the commissioners resumed the hearing to render their decision. The presiding commissioner began with reference to the youthful offender law. He then turned to the Board's conclusion, as follows:

"And having these legal standards in mind and after giving great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity. And I emphasize any subsequent growth and maturity. That's key words here today. We find that Mr. Palmer does pose an unreasonable risk of danger to society or threat to public safety and is, therefore, not eligible for parole. Now, the record does reflect some circumstances tending to show suitability in that he committed his crime as a juvenile, 17 years of age. We make the assumption at 17 he had a diminished culpability as compared to that of adults. And what do we take in consideration in terms of a juvenile, we take in consideration that the background of his mental and emotional development, which we read in the childhood and adolescent development of his background. Those are, those are factors that were considered. How he grew up, where he grew up, and what were the dynamic factors of his home life, school life. We learned that Mr. Palmer, by his own background, was less susceptible to deterrents. He had a lack of maturity, and he had an underdeveloped sense of responsibility as a juvenile and which resulted in him taking ill-conceived actions . . . as demonstrated by his criminal history as a juvenile. Furthermore, this Panel took in consideration that Mr. Palmer based on the life crime, his prior criminality did not weigh the long-term consequences of his actions. He was impulsive. And, furthermore, as I pointed out, he had a lack of maturity, an underdeveloped sense of responsibility, which he did consider and he said was a sense of entitlement, inability to assess the consequences of his actions. This Panel also took in consideration the hallmark features that included the immaturity and failure to appreciate the risks and consequences of the actions of his criminal conduct. Now, we evaluated had he shown maturity. He's shown growth. And has he had positive rehabilitation during his incarceration relative to his age at this time, and we took all that in consideration during deliberation here today. Does he have the ability to demonstrate remorse or reflection on his criminal past, and does his

12

growth demonstrate the ability to not recidivate in terms of criminal thinking. Now, as we move forward, we find that he's at an age that would reduce the probability of recidivism. We're talking 27 years later. He does have realistic plans for release. However, there are some issues that are far outweighed by other circumstances tending to show unsuitability and suggest if released Mr. Palmer would pose a potential threat to public safety."

Then, after discussion of the commitment offense, the presiding commissioner continued:

"So it brings us here today in terms of what do we evaluate him on in terms of the SB 260, in terms of Youthful Offender. Youthful Offender means you committed the crime as a Youthful Offender, but after you've been incarcerated, do you have maturation, do you have growth, have you developed an understanding of your criminality, and have you taken rehabilitative programs to understand the causative factors of your conduct. . . . And that's where we're at here today. So we must consider whether there are any other circumstances coupled with the immutable circumstances that would lead to the conclusion that you're still an unreasonable risk of danger to society. And we find that you are for the following reasons. First let me say this, there's a—I guess there's a new euphemism that people use from time to time that says he or she shot themselves in the foot. Mr. Palmer, you didn't shot [*sic*] yourself in the foot. You shot yourself in both feet and both hands. That's what you did. You're a, you're a smart man. You're a likeable fella. You made a mistake in life, but you have made multiplied [*sic*] that mistake 27 times. You didn't learn from the errors of your ways. You didn't take advantage of the opportunities of rehabilitation. . . . By your own statement, you said you were in denial for 27 years. You were in more than denial. You were not addressing the consequences of your action as an adult. . . . But as recent as 2014 and the prior Panel has asked you to remain disciplinary-free, you have not. You have consistently on an ongoing basis received disciplinary actions for a variety of issues. I went back and read your 115s, and they have a consistently obvious pattern. I didn't do it, and it wasn't me. You've been in denial about your disciplinary history, all of them. You don't accept

13

responsibility for your actions. We're not here to say oh, it's okay. We'll just let you go. It's only a 115. No it's not. It's the inability to follow the rules and regulations of this institution or whatever institution you might be at, and it shows who you are as a person at the time. . . . You've already invested in your bad side. You've got to invest on the good side now. What are you going to do for yourself on the positive side? You say well, no matter what happens here today, I'm going to be positive. Well, time will tell. You've got a gift of gab. You're able to articulate very easily. You talk very well. But your actions will speak louder than your words. You have an opportunity to do the right thing, and you must do the right thing. Your disciplinary history is a factor of your unsuitability. You have a lot of inconsistent statements that we've pointed out here today, both ourselves and the District Attorney. . . . Now, look at this Comprehensive Risk Assessment that took into consideration the hallmark features of youth by Dr. Geca. And we also weighed the private report by Dr. Paul Good. Dr. Paul Good found you a low risk to recidivate. We took that in consideration. . . . We took in consideration Dr. Geca's report that talked about the hallmark features of youth. . . . Page 14, based on analysis, you represent a moderate risk of violence. Now, why's this appropriate or not appropriate but indicative of your denial of parole here today? You present with elevated risks to life-term inmates and non-elevated risks to other parolees. . . . So you were a low-moderate in 2010, and now you're a moderate. Rarely do we see Comprehensive Risk Assessments elevate. Yours is elevated. Why? Although he's reported he has come to understand his behavior problems shortly he's incurred his last Rule Violation in 2014, you will need to demonstrate consistently improving behaviors in these critical areas for a protracted time in order to be able to lower your current determined risk. . . . Until you're honest with yourself, you're going to remain a citizen of this fine institution. And that's unfortunate because you have potential to do other things. Your art. You have other skills, but it's you who keeping [*sic*] yourself down. You can go back to that dorm and say that Parole Panel denied me again. They won't let me out. They are looking at stuff that don't make any difference. You can say that if you want, son. But it's not the truth. Look at your heart, and you know that."

Deputy Commissioner Newman then spoke briefly, beginning as follows:

"Mr. Palmer, by your own testimony today, you said you were the same person in 2014 as you were in 1988. You were selfish, impulsive, reckless, defiant. You put your own needs before doing right. You know, you had a defining moment. And for that, I'm so happy that you had this defining moment. You've spent a lot of time in prison. But when I looked at your MEPD back in '96, you've had eight serious Rule Violations since your MEPD. You're really holding yourself in prison. You're holding yourself from making the growth into a rule-abiding humble individual that is safe for release. Your attorney indicated that she acknowledged your Rule Violations but noted that they weren't violent in nature and that you weren't committing any crimes, but I beg to differ. You had a very sophisticated criminal mentality over a number of years while you were in prison. . . . So really your manipulation of the system to get what you want, to keep what you want, to continue to pay for it is really kind of a disturbing chain of events. And it's was [*sic*] a sustained period of time from 2009 until earlier this year, just a couple of months ago. Your programming right now is very good. You know, I think that you're really honing in on issues that are relevant to you. Issues that give you a stable base of foundation, and it seems to me that your commitment to your spiritual nature is sincere. And for that, I think that you're doing a remarkable job. On our break, I went out to the visiting room, and I looked at the mural you made. And you are a gifted talented artist. The mural is beautiful. . . . Your work is something that you derive a lot of esteem from. And I think as you're growing, your art will continue to grow with you as well. You have the key to this prison in your pocket. You keep dropping it. So I hope you pick it up and hang on to it and make the changes you need to make. And, you know, you have to decide that you're going to obey the rules of the institution and the laws of the state. That I wish you good luck in your future growth."

The Board set the denial at five years, noting Palmer's right to request to advance it. Finally, Palmer asked if there would be a setting of terms at this time, in response to which the presiding commissioner said, "[W]e don't set terms of Youthful Offenders."

## DISCUSSION

### Introduction to the Analysis

The petition makes one argument, that Palmer is entitled to a new hearing consistent with his rights, which argument has two subparts, (A) and (B): "(A.) The Board Violated Mr. Palmer's Rights and This Court's Order by Failing to Set and Consider Mr. Palmer's Base and Adjusted Base Terms," and "(B.) The Board Violated Its Statutory Duty to Mr. Palmer by Failing to Give Great Weight to the Youth Offender Factors." Both subarguments themselves have subparts, with subargument (B) having sub-subparts, the last of which is that the Board did not (and cannot) identify substantial countervailing evidence that Palmer is currently dangerous.

### Palmer Is Entitled to a New Hearing

In *Butler, supra,* 236 Cal.App.4th 1222, we described the benefits resulting from the requirement the Board calculate the base and adjusted base terms. Among these, we said, was that it gives inmates an indication of when it may be appropriate to assert a claim of excessive confinement. And when an inmate does decide to file a claim, having the Board's term-setting calculations enables the petitioner to provide the court with a frame of reference and relevant data in support of his claim. (*Id.* at p. 1243.) As we put it, requiring the Board to promptly set base and adjusted base terms would thus allow "prisoners . . . repeatedly denied parole after having served their adjusted base terms . . . to credibly represent to a reviewing court that the denial of parole resulted in the imposition of punishment that so exceeds his or her culpability that it is constitutionally excessive." (*Id.* at pp. 1243–1244.)

As noted, following our order to show cause, the Board set base and adjusted base terms for Palmer, the former at 10 years, the latter at 12.[2] The Attorney General argues that Palmer's claim is now moot, relying on our opinion in *In re Perez* (2016) 7 Cal.App.5th 65, 101–102.) While we held the issue moot in *Perez*, we did so against

_____

[2] At oral argument the Attorney General said her understanding was that the enhancement was because the life crime was committed while Palmer was on probation.

16

the background of our determination that there was not "some evidence" of dangerousness, and ordering a new hearing for Perez. Here, as will be seen, the setting is different.

Moreover, merely calculating the base and adjusted terms is not an end in itself. As this court has repeatedly explained, the Board must also take into account the adjusted base term's relationship to time served before deciding to deny parole. This is because the adjusted base term is "an approximation of the punishment the Board deems proportionate to the particular prisoner's offense." (*Butler, supra,* 236 Cal.App.4th at p. 1243.)

As we described on an earlier occasion, "Unlike the parole suitability determination, which focuses on whether the inmate is *currently* dangerous and is governed by his or her postconviction behavior, the setting of the base term is designed to insure life prisoners do not serve terms disproportionate to the culpability of the individual offender. The proportionality of a sentence turns entirely on the culpability of the offender as measured by 'circumstances existing *at the time of the offense*.' (*In re Rodriguez* (1975) 14 Cal.3d 639, 652 . . . ." (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 617.)

"Individual culpability . . . is the measure of proportionality." (*Butler, supra*, 236 Cal.App.4th at p. 1239.) The base term allows a court to accurately assess whether a sentence is excessive. This is because the calculated base term reflects the same considerations for determining whether a sentence is cruel or unusual. (*Id.* at pp. 1239–1240.) "[T]he base and adjusted base terms represent an approximation of the punishment the Board deems proportionate to the particular prisoner's offense." (*Id.* at p. 1243.)

In short, the function of the adjusted base term is to indicate the point at which a "denial of parole will result in constitutionally excessive punishment." (*Butler, supra*, 236 Cal.App.4th at p. 1237; see also *In re Dannenberg* (2005) 34 Cal.4th 1061, 1096 ["[E]ven if sentenced to a life-maximum term, no prisoner can be held for a period

17

grossly disproportionate to his or her individual culpability for the commitment offense. . . . [E]ven for reasons of public safety . . . .".) .)

At oral argument the Attorney General argued that the setting of the base term and adjusted base term was not an issue for the Board, only for the courts, which would address constitutional claims. Even assuming this, the issue of excessive punishment must be factored in to the term of the Board's denial. Put otherwise, a five-year denial, as here, reflects 50 percent of Palmer's base term. And were it to stand, it would mean that at his next parole hearing, in 2020, Palmer would have served 32 years—more than three times the base term and over two and one-half times the adjusted base term.

**Evidence of Current Dangerousness**

As indicated, petitioner's final argument is that there was no countervailing evidence of current dangerousness. The Attorney General addressed the issue, and argued there was. Since we reach the result we do, we need not address the issue, though we do briefly comment on it for guidance to the parties on remand.

" '[I]n evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' " (*In re Shaputis* (2011) 53 Cal.4th 192, 209 (*Shaputis*).)

"It is settled that under the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review

18

is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' [Citations.]" (*Shaputis, supra,* 53 Cal.4th at p. 210.)

"While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing. [Citation.] Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor." (*Shaputis, supra,* 53 Cal.4th at p. 211.) "Under the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Id.* at p. 212.)

The Supreme Court called the "some evidence" standard " 'extremely deferential.' " (*Shaputis, supra,* 53 Cal.4th at p. 214.) We have called it "ultralenient." (*In re Morganti* (2012) 204 Cal.App.4th 904, 907.)

The Board concluded there was some evidence here, beginning with Dr. Geca's evaluation, which concluded that Palmer is at present a moderate risk for violence. Dr. Geca had evaluated Palmer in 2010, at which time she had evaluated him as a "low/moderate level of risk for future violent recidivism." Dr. Geca met with Palmer again on September 25, 2014, following which she issued her evaluation the next month, this time, as noted, evaluating Palmer as "moderate" risk.

As the presiding commissioner noted, this is unusual, and it is not clear what it is that transpired between Dr. Geca's 2010 and 2014 reports that caused her to elevate her risk assessment. Nevertheless, Dr. Geca said what she said, and recited some of the things on which she relied, describing Palmer's issues, some of which he had yet to adequately address. Thus, for example, Dr. Geca stated "he [has] yet to understand . . . how pervasive his egocentric worldview is and to what extent it impacts his attributions, interpretations and his behaviors." She also noted that Palmer could not provide a reasonable explanation of how he intended to manage his impulsivity in the future. And "given his track record while in a controlled environment, it could not be reasonably

19

concluded that he would obey all laws in a less restrictive setting." We would have to conclude this was "some evidence."

Moreover, the commissioner indicated in essence that Palmer admitted some maladaptive behavior. That is, until May 7, 2014, he recognized that he was " 'still holding onto [his] criminal thinking' " and feeling entitled to "engage in certain behaviors and not be held accountable," recognizing that he was " 'addicted to an instant gratification.' " Indeed, Palmer admitted that he was the same person in 2014 as he was in 1988.

In addition, the presiding commissioner described Palmer as "consistently on an ongoing basis receiv[ing] disciplinary actions for a variety of issues." The only two incidents referred to were a violation in March 2012, when Palmer was cited for possession of a cell phone, which he immediately admitted was his and which he claimed he used to speak with his family after his mother died. That, of course, was not recent, but before the 2013 hearing.

The only recent rule violation was for an incident on May 7, 2014, for giving Newbill a shirt in the visiting room, a violation Palmer's petition describes this way: Palmer's "girlfriend traveled from Washington state to attend Mr. Palmer's graduation ceremony. Wanting to show his appreciation, Mr. Palmer tried to give her the shirt that he wears to paint. His efforts were unsuccessful, and Mr. Palmer received a rules violation for misuse of handicraft."

Giving a shirt to a girlfriend is, of course, relatively innocuous, but Palmer's prevarications before finally taking responsibility for his actions concerned the Board. That is, Palmer initially denied responsibility for the May 7 violation, and provided contradictory explanations. He first asserted there was "no evidence to prove" he had given Newbill the shirt, and then, in the words of the presiding commissioner, "threw her under the bus" by alleging she could have brought the present into the prison or someone else in visiting could have given her the shirt—this despite Palmer being the only prisoner she was authorized to visit. Only later did Palmer admit the truth.

20

While serious misconduct in prison or actions amounting to criminal misconduct are proper parole criteria, it must be "reliably documented" and there must be a nexus between the rule violation and current dangerousness. (Cal. Code Regs., tit. 15, § 2281, subd. (b) [information considered includes "involvement in other criminal misconduct which is reliably documented" and section (c)(6) states serious misconduct in prison is an unsuitability criteria].) In short, the rule violation must still demonstrate a nexus to present dangerousness. (See, e.g., *In re Moses* (2010) 182 Cal.App.4th 1279, 1309–1310.) Any such nexus here is hard to discern.

Thus, we are left with Dr. Geca's report and Palmer's own description of his state up to May 7, 2014 as the evidence supporting the Board's denial of parole. Applying the ultralenient standard as we must, we would conclude that it is some evidence—but barely. It is an extremely close case.

Palmer's next parole hearing will be sometime in late 2017, some two and one-half years—and not incidentally, with a full one-quarter of Palmer's base term having passed—since his last hearing. We would assume that if Palmer's prison record in those thirty months has been uneventful, the Board could not conclude that there is some evidence of current dangerousness. Put otherwise, if Palmer has kept his promise to the system and to himself, not even Dr. Geca could conclude Palmer is anything but a low risk for violence. [3]

---

[3] Presiding Justice Kline's dissent would hold that the Board violated the youth offender parole statutes, sections 3051, subdivision (f) and section 4801, subdivision (c), by setting Palmer's base term and adjusted base term using the matrices it employs for adult offenders. Palmer did not raise this issue in his writ petition, which is unsurprising given that when he filed the petition the Board had not yet set his base and adjusted base terms. After the matter was fully briefed, we raised the question whether the youth offender statutes must be considered in setting a base term, both in a memorandum to counsel and at oral argument, and offered counsel the opportunity to provide supplemental briefs addressing it. Counsel for both parties declined the opportunity. Because the parties have declined our invitation to brief the issue and the Board has not yet issued regulations implementing the youth offender statutes, we do not reach the issue.

## DISPOSITION

The petition is granted, and the Board is ordered to hold a new hearing as soon as practicable, and in no event later than 120 days of the filing of this opinion.

_____
Richman, J.

I concur:


_____
Stewart, J.

A147177; *In re Palmer on HC*

In re Palmer on Habeas Corpus A147177

Concurring and Dissenting Opinion of Kline, P.J.

I agree with my colleagues that Palmer is entitled to a new youth offender[1] parole hearing as soon as possible, because his base and adjusted base terms had not previously been fixed by the Board, and the hearing therefore failed to comport with the terms of the settlement and stipulated judgment described in *In re Butler* (2015) 236 Cal.App.4th 1222 (*Butler*).

That is not, however, the only issue presented by this case.

Whether the punishment imposed on a prisoner as a result of the denial of parole is constitutionally proportionate turns primarily on the culpability of the offender as measured by the circumstances existing at the time of the offense. (*In re Rodriguez* (1975) 14 Cal.3d 639, 652 (*Rodriguez*); *In re Stoneroad* (2013) 215 Cal.App.4th 596, 617.) The Board assesses culpability primarily by means of base term matrices (and regulations authorizing adjustments to the base term), which are uniformly applicable to all life prisoners, most of whom committed their life crimes as adults. However, recent legislation adopting specific procedures to govern parole determinations for youth offenders directs the Board to, among other things, "give great weight to the diminished culpability of juveniles as compared to adults." (Pen. Code, §§ 3051, subd. (f); 4801, subd. (c).)[2] Because the base term matrices, and regulations relating to adjustments that may be made to the base term, make no distinction between the culpability of youth offenders and that of all other life prisoners, I believe they deny youth offenders the benefit of both the statutes ameliorating their culpability and the constitutional principles inspired by those statutes.

---

[1] A "youth offender" is a life prisoner "who was under 23 years of age at the time of his or her controlling offense." (§ 3051, subd. (a)(1).) "Controlling offense" refers to "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (*Id*., subd. (a)(2)(B).)

[2] All statutory references are to the Penal Code.

1

My colleagues decline to address this because the parties declined our invitation to file supplemental briefs and the Board has not yet issued regulations implementing the youth offender statutes.  I do not believe counsel's strategic decisions about the need for additional briefs, or the Board's delay in promulgating regulations to implementing statutes enacted nearly four years ago, warrant the silence of this court.  As my colleagues acknowledge, Palmer could not in his writ petition have specifically questioned the propriety of the base and adjusted base terms set for him because the Board did not fix those terms until a year after Palmer had filed his petition.  Furthermore, we timely raised the issue in a written notice to counsel prior to oral argument, and the parties addressed the issue at length at oral argument.  The issue is almost certain to affect Palmer adversely, because his base and adjusted base terms have now been set, and the expedited parole hearing we order will be held long before the Board promulgates new regulations, as the Board is still seeking public comment on proposed regulations.  Finally, if the position taken by the Board in this case is any indication, it is not likely the new regulations the Board eventually promulgates will address the problem I have described, which should be of concern to all of us.

Accordingly, I respectfully dissent from my colleagues' unwillingness to question the Board's application to youth offenders of the same base term criteria it applies to adult offenders.

## I.

Section 3051 and subdivision (c) of section 4801—referred to here as "the youth offender statutes"—were added to the Penal Code as a result of the passage of Senate Bill No. 260 (2013-2014 Reg. Sess.) (SB 260), which was signed by the Governor and filed with the Secretary of State on September 16, 2013.[3]  As noted by our Supreme Court in

---

[3] These statutes were also amended by passage of Senate Bill No. 261 in 2015 (Stats. 2015, ch. 471, § 1, eff, Jan. 1, 2016), which raised the age of youth offenders from 18 to 23 years of age, and required the Board to complete by July 1, 2017, all youth offender parole hearings for specified individuals sentenced to indeterminate life terms and determinate terms, and to provide all such individuals a specified consultation before July 1, 2017.

2

*People v. Franklin* (2016) 63 Cal.4th 261, 277, the Legislature passed SB 260 for the explicit purpose of bringing the parole process into conformity with the opinions of the United States Supreme Court in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and the consonant opinion of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), which held that the defendant's 110-year sentence was the "functional equivalent" of life without parole and therefore violated *Graham's* prohibition of such sentences for juveniles convicted of nonhomicide crimes. The meaning of these opinions therefore informs the meaning of the youth offender statutes.

*Miller* held that the Eighth Amendment forbids a sentencing scheme mandating life in prison without possibility of parole for juvenile homicide offenders. The *Miller* court relied primarily on *Graham* and *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) to explain why children are constitutionally different from adults for sentencing purposes. "First, children have a ' "lack of maturity and an underdeveloped sense of responsibility" ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers, they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Miller, supra*, 567 U.S. at p. 471; accord, *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1388-1389.)

The *Miller* court noted that "[o]ur decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well. [Citation.] In *Roper*, we cited studies showing that ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." [Citations.] And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' [Citation.] We

3

reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' " (*Miller*, *supra*, 567 U.S. at pp. 471-472.)

As *Miller* says, *Roper* and *Graham* "emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because ' "[t]he heart of the retribution rational" ' relates to an offender's blameworthiness, ' "the case for retribution is not as strong with a minor as with an adult." [Citations.] Nor can deterrence do the work in this context, because ' "the same characteristics that render juveniles less culpable than adults" '—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." (*Miller*, *supra*, 567 U.S. at pp. 472-473.) Accordingly, as our Supreme Court recently observed, *Roper* and its progeny show that "[s]ome punishment is cruel and unusual as it pertains to juvenile offenders, even though the same sanction may not run afoul of the Eighth Amendment when applied to adults." (*In re Kirchner* (2017) 2 Cal.5th 1040, 1046.)

The Eighth Amendment issue in this case differs from that in *Miller*, *Graham*, *Roper*, and *Caballero*, and the cases they rely upon because, unlike the juveniles in those cases, Palmer was not convicted of a homicide, was not sentenced to life without the possibility of parole, does not claim his sentence is the functional equivalent of life without parole, and does not challenge the life sentence he received. The relevance of those cases is their recognition of the significance, for constitutional purposes, of the diminished culpability of youth offenders. By enacting the youth offender statutes, which are not crime specific, the Legislature mandated that, for the reasons described in *Miller*, *Graham*, *Roper*, and *Caballero*, youth offenders sentenced to indeterminate life terms and eligible for parole or to substantial determinate terms shall *all* be treated a bit differently from other life prisoners. (§ 3051, subd. (b)(1).)

At the time Palmer pled guilty to and was sentenced for kidnapping for purposes of robbery, section 209, which criminalizes that act, provided in subdivision (b) that "any

4

person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole." No minimum term was specified. Accordingly, although Palmer remains eligible for parole, there is no statutory reason he cannot be imprisoned for life if the Board repeatedly finds him unsuitable for release on parole. As the sentencing court told Palmer, after initially serving time in a juvenile youth facility, "you will be transported to state prison until you are finally released on parole, if you are in fact ever released on parole."

However, under both the California and United States Constitutions, "even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement . . . violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1096 (*Dannenberg*).) Our Supreme Court has acknowledged that subdivision (b) of section 3041, which authorizes a more lengthy period of incarceration than normal for inmates whose release would endanger public safety, "cannot authorize such an inmate's retention, even for reasons of public safety, beyond this constitutional maximum period of confinement." (§ 3041, subd. (b).)

The issue in this case is not the constitutionality of the punishment imposed on Palmer as a result of the Board's denial of parole, but whether the Board's *process* for determining his individual culpability for the life crime, and that of all youth offenders, satisfies the mandate of the youth offender statutes. Specifically, the question is: may the base term matrices set forth in title 15 of the California Code of Regulations (Regs.),[4]

---

[4] Under Board regulations, "[t]he base term shall be established solely on the gravity of the base offense, taking into account all of the circumstances of that crime. The base offense is the most serious of all life offenses for which the prisoner has been committed to prison. [¶] The base term shall be established by utilizing the appropriate matrix of base terms provided in this section for the base offense of which the prisoner was convicted. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation. [¶] If the panel finds circumstances in aggravation or mitigation as provided in [Regulations sections]

5

section 2282—which provide the criteria employed by the Board to assess Palmer's and any life prisoner's culpability for his or her commitment offense and the proportionality of the punishment imposed for that offense—be the same for youth offenders as for all other life prisoners?

By enacting the youth offender statutes, the Legislature answered this question in the negative.

**II.**

Under section 3051, a person convicted of a controlling offense committed before he or she attained 23 years of age for which the sentence was (1) a determinate term, (2) a life term of less than 25 years to life, or (3) a life term of 25 years to life, shall respectively be eligible for release on parole at a youth offender parole hearing, during his or her 15th, 20th, and 25th year of incarceration.  (§ 3051, subd. (b)(1)(2)(3).)  "At the youth offender parole hearing, the Board shall release the individual on parole as provided in Section 3041"—the procedure employed for adult offenders —"except that the board shall act in accordance with subdivision (c) of Section 4801."  (§ 3051, subd. (d).)

The youth offender statutes conform our parole process to the teachings of *Miller*, *Graham*, *Roper*, and *Caballero* by ensuring that, the Board "shall provide for a meaningful opportunity for release" when reviewing a youth offender's suitability for parole pursuant to section 3041.5, and shall give great weight to "the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual."[5]  (§§ 3051, subds. (e) &

---

2283 or 2284, the panel may impose the upper or lower base term provided in the matrix, stating the specific reason for imposing such a term.  A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case."  (Regs., § 2282, subd. (a).)

[5] As noted in *People v. Franklin, supra,* 63 Cal.4th at page 283, these statutory provisions echo language of the United States Supreme Court in *Miller*, *supra*, 567 U.S. at page 477 ("chronological age and its hallmark features"), *Graham*, *supra*, 560 U.S. at page 75 ("meaningful opportunity to obtain release"), and *Roper*, *supra*, 543 U.S. at page

6

(f)(1), 4801, subd. (c).)  The new scheme also requires that any psychological evaluations and risk assessments used by the Board at the youth offender parole hearing "shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth and any subsequent growth and increased maturity of the individual."  (§ 3051, subd. (f)(1).)

"The diminished culpability of juveniles as compared to that of adults" and the "hallmark features of youth" are distinct from "any subsequent growth and increased maturity" of a youth offender.  The latter factor comes into play postconviction during the Board's evaluation of a life prisoner's current dangerousness and suitability for release.  "The diminished culpability of juveniles as compared to adults" and "hallmark features of youth" relate primarily to a quite different matter:  the constitutionality of punishment as measured by the culpability of the offender at the time he or she committed the controlling offense.  (§§ 3051, subd. (f)(1); 4801, subd. (c).)

Consistent with the terms of the settlement and stipulated judgment described in *Butler*, the Board ordinarily fixes the base and adjusted base terms for life term prisoners " 'at their initial parole consideration hearing, or at the next scheduled parole consideration hearing that results in a grant of parole, a denial of parole, a tie vote, or a stipulated denial of parole hearing.' "  (*Butler*, *supra,* 236 Cal.App.4th at p. 1229.)  Unlike the question of whether the life prisoner is currently dangerous, which turns mainly on the prisoner's postconviction conduct in prison, the base and adjusted base terms, which are based only on the circumstances of the commitment offense, relate to the level of the offender's individual culpability or blameworthiness for that offense; they measure "gradations of culpability."[6]  (*Rodriguez, supra*, 14 Cal.3d at p. 647.)  The base

571 ("diminished culpability of juveniles"); accord *Caballero*, *supra*, 55 Cal.4th at page 268, footnote 4.

[6]  For example, the base term matrix for Palmer's offense, kidnapping for robbery or ransom in violation of section 209, which is set forth in Regulations section 2282, subdivision (c), consists of a horizontal and a vertical axis.  The horizontal axis, which measures the treatment of the victim, also consists of four levels of increasing severity, each identified by a capital letter:  A. the prisoner's movement of the victim "was of short

7

and adjusted base terms relate to the proportionality of punishment, and become significant only at the parole hearing at which the Board considers the base and adjusted base terms in the process of deciding whether the prisoner is suitable for release. Once these terms are set they are ordinarily not recalculated because they do not relate to postconviction factors. The purpose of the base term is to inform the Board, the life prisoner and his or her counsel (and, in the event of a claim, the court) whether the denial of parole and the period prior to the next parole hearing may result in punishment disproportionate to the prisoner's culpability for the base offense.

Thus, the Board is called upon to make two decisions at the suitability hearing. The first, which turns primarily on postconviction factors, including "the subsequent growth and increased maturity" of the youth offender while incarcerated, is whether the prisoner remains dangerous. If the prisoner is deemed no longer dangerous and suitable for release, the base and adjusted base terms do not play a significant role. If, however, the prisoner is deemed currently dangerous, the Board panel must inquire at the suitability hearing whether the amount of time the prisoner has already been imprisoned, plus the amount of time that will have passed before the next parole hearing set for the prisoner by the Board, so exceeds the prisoner's adjusted base term that it may constitute punishment disproportionate to the prisoner's culpability for the life crime.

The original version of the regulations requiring the parole authority (then the Adult Authority) to set the base term were promulgated in 1976 in response to the

duration and resultant location would not substantially increase risk of harm"; B. the "[m]ovement was of lengthy duration or resultant location would substantially increase risk of harm"; C. the "[v]ictim was taken as a hostage; and D. "[t]he crime involved intricate prior planning." The vertical axis, which measures the harm personally suffered by the victim, consists of four levels of increasing severity, each identified by roman numerals: I. the victim was "unharmed or received minor injury"; II. the victim was "sexually assaulted or otherwise seriously injured or assaulted; III. the "[v]ictim's major injuries required extensive treatment or the victim was seriously disabled; and IV. the "[v]ictim died."

Because Palmer's victim was I. "taken as a hostage," and his victim was C. "unharmed or received minor injury," the matrix specified a sentence triad of "10-12-14," and the Board selected the mitigated 10-year term.

8

directive of *Rodriguez*. Those regulations defined that term as "the maximum period of time *which is constitutionally proportionate to the individual's culpability for the crime*." (Former Cal. Admin. Code, tit. 15, §§ 2000-2725.) In *Rodriguez*, the Supreme Court expressed deep concern that, because the Adult Authority did not then fix life prisoners' primary or base term until after it found the prisoner suitable for release (as was also the case prior to the settlement and stipulated judgment in *Butler*), the parole process was not "being administered in a manner which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability [citation], or, that their terms will be fixed with sufficient promptness to permit any requested review of their proportionality to be accomplished before the affected individuals have been imprisoned beyond the constitutionally permitted term." (*Rodriguez, supra*, 14 Cal.3d at p. 650.) In order to allay this concern the *Rodriguez* court developed the concept of the primary or base term and directed that it be promptly set by the parole authority at the time the offender entered prison.[7]

---

[7] *Rodriguez* reasoned that, since a prisoner sentenced to a maximum term disproportionate to his individual culpability has a right to have his term fixed at a number of years that is proportionate to his offense, "[i]t follows, since the language of the [ISL] does not require a contrary conclusion, and since we presume that the Legislature intended that both the penalty provisions of statutes defining felony offenses and the administrative provisions of the [ISL] would be constitutional, the [parole authority] must fix terms within the statutory range that are not disproportionate to the culpability of the individual offender. The oft-stated rule that a prisoner has no right to a term fixed at less than maximum [citation] is therefore subject to the overriding constitutionally compelled qualification that the maximum may not be disproportionate to the individual prisoner's offense. [Citation.]

"This basic term fixing responsibility of the [parole authority] is independent of the [parole authority's] power to grant parole and of its discretionary power to later reduce the term thus fixed, which fixed, constitutionally proportionate, term we shall hereafter refer to as the 'primary term.' The [parole authority's] power to grant parole and to later reduce the primary term remain unaffected. That power enables the [parole authority] to give recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to lead a crime-free life in society. On the other hand, this discretionary power also permits the [parole authority] to retain a prisoner for the full primary term if his release might pose a danger to society [citation] and to revoke parole,

9

*Rodriguez* was decided shortly before replacement of the Indeterminate Sentence Law (ISL) with the Determinate Sentence Law (DSL), and unlike the term required to be fixed by *Rodriguez*, which was deemed the maximum term that could be imposed, the base term does not now purport to be the maximum term. (*Dannenberg*, *supra*, 34 Cal.4th at p. 1096) Nevertheless, as a result of the settlement and stipulated judgment described in *Butler*, which requires that the base and adjusted base terms be set prior to the parole hearing so they may be considered by the Board at the time it determines suitability for release, the base term now serves much the same three purposes intended by the *Rodriguez* court.

*First*, as I have said, because it represents an assessment of culpability for the controlling offense, the base term and any adjustments thereto enable the Board to know whether, as measured by the Board's own matrices and other regulatory criteria, the denial of parole might result in disproportionate punishment and be constitutionally excessive. After the *Butler* settlement, the suitability determination is not rigidly governed by the culpability assessment, but it still takes place in the shadow of that assessment. *Second*, the base and adjusted base terms similarly inform the inmate and his or her counsel whether the denial of parole could tenably be challenged as cruel and/or unusual. (*Rodriguez, supra*, 14 Cal.3d at p. 654, fn. 18.) And *third*, in the event an inmate seeks judicial review, the level of culpability reflected in the base and adjusted terms makes possible the type of meaningful review of Board actions to which prisoners are entitled. (*Ibid*.)[8] Thus, while the base term no longer necessarily represents a

rescind an unexecuted grant of parole and refix a reduced term at a greater number of years up to the primary term if the prisoner or parolee engages in conduct which affords cause to believe he cannot or will not conform to the conditions of parole, or would pose a danger to society if free. [Citations.]" (*Rodriguez, supra,* 14 Cal.3d at p. 652.)

[8] As the *Rodriguez* court noted, "Were unrepresented prisoners required to take the initiative by seeking relief at such time as they believed their continued imprisonment to be constitutionally impermissible . . . courts would continue, as now, to receive inadequate petitions unaccompanied by necessary supporting data. . . . Once the primary term is fixed by the [parole authority], however, all of the relevant data regarding the particular inmate, the circumstances of his offense, and the criteria upon which the term

"maximum period of time," it continues to serve as a *measure* of the period of time "constitutionally proportionate" to an indeterminately sentenced prisoner's "individual culpability" for his or her controlling crime.

In its return to the order to show cause, the Board "denies that . . . a prisoner's base term is a measure of his individual culpability for his commitment offense."[9] At oral argument, the Board was inexplicably unwilling to disclose its view of the purpose of the base term it has been setting for more than 40 years, if not to measure culpability on the basis of the circumstances of the base crime. But the Board did state its view in *Butler*, where it took the position that the base and adjusted base terms "related only to uniformity" in sentencing. (*Butler, supra,* 236 Cal.App.4th at p. 1236.) We agreed the base and adjusted base terms relate to uniformity, but explained that they also relate to proportionality, which unlike uniformity pertains to a constitutional, not just a statutory, principle. As we said, "[u]niformity and proportionality, the dual sentencing principles the Legislature thought best served the punitive purpose of the DSL (§ 1170, subd. (a)(1)), are conceptually related. The principles can conflict: Imposing the same sentence on all persons convicted of an offense would serve the purpose of uniformity, but it would disserve the principle of proportionality because no offense is always committed in the same circumstances and those who commit the same offense are not all

is based will have been marshaled by the [parole authority], thus enabling petitioner to set out the basis or bases for his complaint, while at the same time providing the court with a record adequate to permit meaningful review. (*Rodriguez*, *supra*, 14 Cal.3d at p. 654, fn. 18.)

[9] The Board also takes the position that "Palmer has waived any claim that his sentence is constitutionally disproportionate (and thus constitutes cruel and unusual punishment) because he pleaded guilty to the life crime." *People v. Panizzon* (1996) 13 Cal.4th 68, the sole authority the Board relies upon for this proposition, does not support it. As material, *Panizzon* only finds that a defendant who entered a plea of guilty or no contest on the basis of a waiver and plea agreement was barred from challenging the negotiated sentence *on appeal,* since the terms of the plea bargain prohibited such a challenge. Neither *Panizzon* nor any other authority bars an inmate who plead guilty pursuant to a plea agreement in which he waived the right to appeal from challenging the constitutionality of the punishment he received by means of a writ of habeas corpus.

11

equally culpable or blameworthy.  But the two sentencing principles usually do not conflict and in practice they are largely complementary.  Both are linked to retribution and both also serve the law's preference for discernible norms and enhance public respect for the criminal law and criminal justice systems, which is essential to the reduction of crime.  [Citations.]"  (*Id.* at pp. 1236-1237.)

As used in the youth offender statutes, the word "culpability" refers to the offender's moral responsibility or blameworthiness for the life crime.  It is in that respect that culpability serves as a measure of the proportionality of the punishment the offender receives for committing that crime.

**III**.

The Board claims it gave "great weight" to Palmer's "diminished culpability as a juvenile as compared to that of an adult" (§ 4801, subd. (c)(1)) because, as the presiding commissioner stated in the panel's decision, the panel found Palmer unsuitable for release only "after giving great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity."  But that statement is opaque.

Having found Palmer possessed all of the youth factors identified in the youth offender statutes, the Board made no effort to explain why these factors were outweighed by the gravity of Palmer's commitment offense and his rules violations.  Never during its lengthy discussion of the gravity of Palmer's commitment offense did the Board mention the fact that Palmer was 17 years old at the time he committed the crime, or appear influenced by Palmer's "diminished culpability."  Save for several conclusory assertions that it had taken the youth offender factors into account, nothing in the panel's decision suggests Palmer was treated any differently by the Board than he would have been if he had committed his controlling offense after attaining the age of 23.

The meaning of the phrase "great weight" is clearly at the heart of this dispute. The Board believes this phrase is self-explanatory and not in need of definition; Palmer disagrees and believes we should adopt the meaning attributed to the phrase by the

12

Supreme Court in *People v. Martin* (1986) 42 Cal.3d 437, 441 (*Martin*). Palmer has the better argument.

*Martin* was a case in which, pursuant to a statutory duty to review sentences to determine whether they are " 'disparate in comparison with sentences imposed in similar cases,' " the Board notified the trial court that the defendant could not legally be sentenced to more than 11 years imprisonment, that even an 11-year sentence was disparate, and that the sentence should fall into a range of 5 to 10 years. The trial court granted the Board's motion to recall the sentence only insofar as it asserted legal error and resentenced the defendant to 11 years. The defendant appealed, contending that the trial court abused its discretion by not sentencing him to a term within the range recommended by the Board. The issues before the Supreme Court were the steps that need to be taken by a trial court when notified that the Board considers its sentence disparate and the need for a statement of reasons for the court's decision. The high court concluded that the determination of the parole board that a sentence is disparate is entitled to "great weight." *Martin* explained that the Board's finding of disparity did not require the court to recall its sentence, but that, "giving great weight to the finding *does require the court to recall its sentence unless there is substantial evidence of countervailing considerations which justify a disparate sentence.*" (*Martin*, *supra*, 42 Cal.3d at p. 448, italics added.) The court pointed out that requiring the trial court to merely " 'consider' " the finding of disparity "gives no weight at all to that finding" because "[t]he judge would remain free to disregard the finding for any reason, or no reason at all," and without findings the judge's decision "would not be subject to effective appellate scrutiny." (*Ibid*.)

The statutory scheme at issue in *Martin* was different from that at issue here, but both applied to criminal sentencing, and the reasoning of *Martin* remains pertinent. *Martin* required the trial court to give reasons for rejecting the parole board's recommendation because the Board "has acquired extensive experience and expertise in the comparative review of sentences" and "gathered data, establishes statistical methods of analysis, and devised computer simulation," and the trial judge "may have little or no

13

experience in comparative review of sentences," and his or her "understanding of statistical methods and computer simulations may be fragmentary." (*Martin, supra,* 42 Cal.3d at p. 446.) The youth offender statutes direct the Board to give the youth factors "great weight" for different but equally important reasons. As federal and state courts have explained, and the Legislature is aware, indifference to factors justifying more lenient sentencing of youth than adult offenders enhances Board compliance with constitutional principles. Members of Board hearing panels need not be lawyers and many are not, and they may well be unaware of the jurisprudence relating to the cruel and/or unusual punishment provisions of the state and federal Constitutions.

Further, as noted in *Martin*, "a requirement of articulated reasons to support a given decision serves a number of interests: it is frequently essential to meaningful review; it acts as an inherent guard against careless decisions, insuring the [decision-maker] analyzes the problem and recognizes the grounds for his decision; and it aids in preserving public confidence in the decision-making process by helping persuade the parties and the public that the decision-making is careful, reasoned and equitable." (*Martin, supra,* 42 Cal.3d at p. 450, citing *In re Podesto* (1976) 15 Cal.3d 921, 937.) Relieving the Board of the responsibility to explain why the youth factors are outweighed by countervailing considerations would diminish the effect of the youth offender statutes and the constitutional principles that motivated them, impair the integrity of the parole process, and undermine judicial review.[10]

---

[10] As earlier noted, the Board has not yet approved new regulations implementing the youth offender statutes. However, the proposed regulations the Board most recently considered, which would add article 14 to chapter 3 of title 15, California Code of Regulations, includes a new provision, section 2446, subdivision (d), that states as follows: "A hearing panel shall find a youth offender suitable for parole unless the panel determines, even after giving great weight to the youth offender factors, that public safety requires a lengthier period of confinement because the circumstance of the commitment offense, when combined with the offender's pre- or post-conviction history, or his or her current demeanor and mental state, indicate that the [youth] offender remains an unreasonable risk to public safety." Nothing in the proposed regulations imposes a duty on a hearing panel to *explain why* the youth offender factors are outweighed by one or more competing considerations.

14

Moreover, the Board's conclusion that Palmer's commitment offense, kidnapping for the purpose of robbery, was unusually "cruel" and "atrocious" is belied by the 10-year base term subsequently set for Palmer which, as measured by the objective factors employed in the pertinent matrix, is the lowest possible midterm in that matrix, presumably because Palmer's victim was "unharmed," the offense "did not involve intricate prior planning," and though his victim "was taken as a hostage" none of the most aggravating factors incorporated in the matrix were applicable. (See Regs., § 2283, subd. (c).) Had the Board fixed the base term before determining suitability for release and considered it at the hearing, it would have had difficulty using the gravity of Palmer's offense as a basis upon which to deny parole, as Palmer's counsel would undoubtedly have pointed out.

Furthermore, as Justice Richman points out, even the base term fixed for Palmer after he was denied parole—which does not give any discernible weight, let alone "great weight," to the "diminished culpability of juveniles as compared to that of adults"— suggests that the denial of parole may result in constitutionally excessive punishment. Had it been set earlier, it would have alerted the Board, or at least Palmer and his counsel, that the denial of parole for five years would result in punishment of 32 years, more than three times Palmer's belatedly set base term and two and one-half time his adjusted base term. A base term that *did* give "great weight to the diminished culpability of juveniles as compared to adults" would undoubtedly point even more powerfully to the imposition on Palmer of constitutionally excessive punishment.

The Board's theory of this case explains why it attaches so little significance to the youth offender statutes. The central point of the Board's return to the petition is that the provisions of the youth offender statutes that accelerate the *eligibility* of youth offenders for release on parole (i.e., § 3051, subd. (b)(1)(2)(3)), do not mandate their release when they become eligible. As the Board states in its return, "consideration of the youth

The proposed regulations submitted for Board vote at its November 2016 Executive Board meeting are public records and available at: <http://www.cdcr.ca.gov/BOPH/reg_revisions.html>

15

factors does not diminish the Board's discretion to deny parole when the record demonstrates that the inmate would pose a current, unreasonable risk to public safety." Arguing that the enhanced eligibility for parole of youth offenders does not bar their commitment to prison for life, the Board points to the legislative declaration [in the uncodified portion of SB 260] that " '[n]othing [in the youth offender statutes] is intended to undermine the California Supreme Court's holdings in *In re Shaputis* (2011) 53 Cal.4th 192, *In re Lawrence* (2008) 44 Cal.4th 1181, and subsequent cases' when the parole authority concludes an inmate sentenced to life with the possibility of parole remains a current risk to public safety." As the Board states in its own regulations, "*Regardless of the length of time served*, a life prisoner [presumably including an indeterminately sentenced youth offender] shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs., § 2402, subd. (a), italics added.) In short, the Board believes that where, as here, a youth offender is determined by the Board "to pose an unreasonable risk of danger to society," there can be no limit upon its power to deny parole.

But nothing in *Shaputis* or *Lawrence* or any other case contradicts the statement in *Dannenberg,* that prisoners sentenced to life-maximum terms cannot be held for periods disproportionate to their individual culpability for the life crime, and that section 3041, subdivision (b), which authorizes the Board to deny a life inmate parole, "cannot authorize such an inmate's retention, *even for reasons of public safety*, beyond the constitutional maximum period of confinement." (*Dannenberg*, *supra*, 34 Cal.4th at p. 1096, italics added.) Refusing to confront the constitutional limitations on its power, the Board's conception of its own authority renders meaningless the base and adjusted base terms mandated by its own regulations.

The Attorney General stated at oral argument that the setting of the base and adjusted base term was not an issue for the Board, but only for the courts, because only the courts address constitutional claims. This statement is deeply distressing. As the Legislature has declared, the punitive, rehabilitative, and restorative purposes of our

16

parole process are best served, when incarceration is ordered, "by terms that are proportionate to the seriousness of the offense" and uniform. (§ 1170, subd. (a)(1).) The denial of parole is an administrative not a judicial act. The Board, not the courts, is the agency initially responsible for ensuring that the punishment imposed on indeterminately sentenced life prisoners by the denial of parole is proportionate to the individual culpability of those prisoners for the criminal conduct for which they were imprisoned. Stimulated by the Supreme Court in *Rodriguez*, the Board has for many decades refined the process of setting base and adjusted base terms and in *Butler* it voluntarily agreed to advance the setting of those terms so they could be considered by the Board during the process of determining suitability for release. The base term was created for the very purpose of measuring culpability and proportionality, and it could easily be adjusted to acknowledge the "diminished culpability" of youth offenders.[11] No reason appears why the Board should not use the base term for that purpose, which would give youth offenders a benefit the Legislature clearly intended them to receive.

There can be no doubt the Board ignored Palmer's status as a youth offender when it belatedly set his base and adjusted base terms. Being a youth offender is not a factor taken into account on the matrix used by the Board to set Palmer's base term, nor is it among the circumstances permitted by Board regulations to be used in mitigation of a base term. (Regs., § 2284.) Furthermore, although it appears Palmer's base term might have been adjusted downward under a Board regulation promulgated prior to enactment of the youth offender statutes,[12] the Board instead adjusted the base term by *adding* two more years on the ground he had previously committed multiple crimes. (Regs., § 2323.)

---

[11] The Board could accomplish this in several ways, perhaps the easiest of which is to amend Regulations section 2284 by adding a life prisoner's status as a youth offender as a circumstance in mitigation of the base term.

[12] Regulations section 2323, entitled "Adjustments for Commitment Factors," states that "A sentence for a youthful offender under [Penal Code section] 1202b may be interpreted as a recommendation for leniency by the committing court and the total period of confinement may be decreased." Section 1202b, which was repealed in 1976 (Stats. 1976, ch. 1139, § 274, p. 5146), provided for a minimum term of imprisonment for

17

**IV.**

If, as the Legislature says, the culpability of a juvenile for a felony offense is ordinarily less than that of an adult, the point at which punishment arguably becomes disproportionate, and therefore constitutionally excessive, cannot ordinarily be the same for a juvenile as it is for an adult. As the United States Supreme Court has said, "[a]n offender's age is relevant to the Eighth Amendment, and *criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed*." (*Graham, supra,* 560 U.S. at p. 76, italics added.)

For the foregoing reasons, I would order the Board not just to conduct a new parole hearing as soon as possible, but also to first set base and adjusted base terms for Palmer that are appropriately less than those set for life prisoners who committed kidnapping for robbery after attaining 23 years of age, or to explain why they do not do so.

_____
Kline, P.J.

---

defendants under 23 years of age. Although former section 1202b has been repealed, the purpose of the regulation is similar to that of the youth offender statutes.

*In re Palmer on Habeas Corpus* (A147177)

Counsel:

O'Melveny & Myers, Cara Gagliano, Megan L. Havstad, Geoffrey Yost for Petitioner.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Jessica N. Blonien and Julie A. Malone, Acting Assistant Attorneys General, Phillip J. Lindsay, Senior Assistant Attorney General, Sara J. Romano and Denise A. Yates, Deputy Attorneys General for Respondent.